## S. P. DONLEY v. J. A. TINDALL AND ANOTHER.

1—There can be no controversy as to the general principle of the admissibility of extrinsic evidence to explain written instruments.

2—The rule that parol evidence, to affect written contracts, must be confined within the strict limits of exposition and interpretation, is based upon the assumption that the written contract has a legal existence and is valid.

3—The general rule that all parol agreements and negotiations between the parties to a written contract, anterior to or contemporaneous with the written contract, are to be regarded as merged in it, is admitted; but this general rule does not exclude parol evidence of subsequent verbal agreements, varying the terms of the written contract.

4—Though the written instrument is thus to be regarded as embracing the entire contract at the time of its execution, yet this is only predicated of contracts which are lawful in their character; and the rule cannot be invoked to cover, protect, enforce or sanction such contracts as may by extrinsic evidence be shown to have been entered into contrary to public policy, or to public morals, or otherwise to be unlawful.

5—With reference to such illegal contracts, the distinction is clearly drawn between such as are executory and sought to be enforced and such as are actual conveyances or are already executed.  The former may be avoided, but the latter can not be avoided by the immediate parties to them.

6—The principle inflexibly observed in such cases is, that courts will neither aid in the execution of an illegal executory contract, nor relieve from an illegal contract a party who has executed it.

7—Parties who, during the late rebellion, contracted on the basis of Confederate money, and thus speculated on the chances of the failure of the Government, whose authority they contemned, must abide the results; they need not look to the courts to effectuate contracts which, no matter how remotely or contingently, contemplated the destruction of the Government.

8—Nor, on the other hand, when such a contract has been executed, need a party to it expect the courts to restore to him what he has parted with in pursuance of a forbidden bargain.  This is the case to which is applicable the maxim, *in pari delicto, potior est conditio defendentis et possidentis.*

9—There is no analogy between this class of cases and one in which a party seeks to avoid a conveyance or contract which is fraudulent only as against creditors, and which, consequently, is valid as between the parties, though voidable by creditors.

10—The plea in the present case, therefore, to the effect that the note sued on was payable in Confederate money, presented a good defense to the action, notwithstanding that the note on its face called simply for "dollars," and it was competent for the defendant to establish that defense by parol proof.

11—The foregoing rulings are made without reference to the seventh section of Ordinance No. 11 of the Constitutional Convention of 1866. That section of the Ordinance conflicts with the Constitution of the United States, and is consequently void, for the reason that it seeks to give validity to illegal contracts.

By Lindsay, J., *dissenting:*

1—The principle has been too long and too well settled to be now brought into debate, that when there is no ambiguity in the terms of a written instrument, the instrument itself shall be its own interpreter, and the only criterion of the intention of the parties.

2—This principle totally excludes parol evidence to contradict the writing itself, although such evidence might clearly show that the real intention of the parties was at variance with the expressions used in the written instrument. And this principle obtains both at law and in equity.

3—It is conceded that a contract stipulating for performance by the payment of Confederate money was and is illegal, and can have no standing in court.

4—But when a contract is reasonably susceptible of two meanings—one legal and the other not—that interpretation shall be put upon it which will support and give it effect. The presumption of law is always in favor of the legality of a contract.

5—The note sued on being payable in "dollars," the law will intend that the legal currency of the country is the money contracted for, and therefore the aid of parol testimony is not needed to settle a question which is thus solved by the rules of law. There is no ambiguity to be explained.

6—The note sued on being unambiguous and perfectly legal in all its terms, and the consideration for which it was given (to wit, a saw mill) being also a lawful consideration, a plea that the note was payable in Confederate money should not have been sustained, nor parol evidence have been admitted to establish such a plea, without any allegation of fraud, accident or mistake.

7—This case, therefore, is not analagous to the case of Smith v. Smith, 30 Texas Reports, 754, in which the illegality of the contract and the turpitude of the consideration were apparent on the face of the instrument sued on.

8—Section seven of Ordinance No. 11 of the Constitutional Convention of 1866, providing that parol testimony may be introduced to prove that

Confederate money was intended in written contracts executed during the rebellion, is in conflict with the Constitution of the United States, and therefore void, for the reason that it impairs the obligation of contracts entered into between parties, and by them reduced to writing.

APPEAL from Cherokee.     Tried below before the Hon. Samuel L. Earle.

This suit was brought on the 7th of November, 1865, by S. P. Donley against John A. Tindall and S. E. Campbell.     The cause of action was a promissory note, as follows:

"$5000.     On or before the 25th day of December next, we or either of us promise to pay J. M. Brittain, or bearer, the sum of five thousand dollars, value received.     Aug. 22d, 1863.

"JOHN A. TINDALL,<br>
"S. E. CAMPBELL,<br>
"JOHN TINDALL."

John Tindall being dead at the institution of the suit, the other makers only were sued.

The only portion of the pleadings necessary to notice is the answer of the defendants setting up the defense referred to in the opinion of the court.     That answer alleged that the note was given in consideration of a steam mill at Knoxville, in Cherokee county, purchased by defendant, John A. Tindall, from J. M. Brittain, the payee of the note; and "that it was expressly understood and intended by defendant and said Brittain that said contract and note were made in view of Confederate money, and to be discharged and paid in Confederate money at its face value, and the price of said mill was fixed and agreed upon, and valued in said contract, in Confederate money value; each party to said contract to abide by the uncertainty and fluctuation of said currency, which Confederate money was not worth at that time more than five cents to the dollar."

The answer further alleged that Brittain held the note until after it fell due, when he transferred it to one Doty, who had

notice that it was payable in Confederate money; and similar allegations were made as to all subsequent holders, including the plaintiff Donley.

To this answer the plaintiff excepted, because it proposed to vary the terms of a written contract without any averment that by fraud, accident or mistake the true agreement of the parties was not expressed in the contract as evidenced by the note.

The exceptions to the answer were overruled and the cause proceeded to trial at the spring term, 1868. The plaintiff read the note and rested his case. The defendants introduced Brittain, the original payee of the note, and proved by him that the agreement between him and Tindall was that Confederate money should be taken for the note. The plaintiff objected to this evidence, but his objection was overruled, and he excepted. Brittain further proved that when he transferred the note to Doty he informed the latter that it was payable in Confederate money. This witness also stated that the mill was worth from $800 to $1000 in coin at the time of the trade, and that Tindall paid him $5000 Confederate money in cash, besides the note sued on.

Defendants proved by another witness that at the date of the note Confederate money was worth from ten to twelve cents on the dollar.

The plaintiff then read the deposition of J. M. Anderson, who stated that he became the owner of the note in the summer or fall of 1864. He purchased it under the full belief that it was a specie demand. That when he inquired of J. M. Brittain about the consideration the latter told him that there was nothing said at the time of the transaction about taking Confederate money in payment of the note. Witness transferred it to the plaintiff Donley in payment of specie indebtedness.

The court below instructed the jury that if the note was to be paid in specie or legal tender United States treasury notes, they should find for the plaintiff, but if it was payable in

Confederate money, their verdict should be for the defendants.

The verdict was for the defendants, and judgment was entered against plaintiff for costs.

Plaintiff moved for a new trial, which was refused, and he appealed.

*S. P. Donley,* in proper person.

The appellant contends that without allegation and proof that by fraud, accident or mistake the writing does not state the agreement correctly; that it was not competent by proof to show that the note was payable in a currency other than specie.

The word "dollar" has a certain definite well known meaning; it means a coin, having a certain amount of gold or silver in it. (Act of Congress, April 1792; Webster's Dictionary.)

The meaning of the word is as certain and unequivocal as if the note had been for a certain amount in weight of gold or silver metal of a certain fineness. And it was not competent by parol evidence to contradict or vary the meaning of the words used in the note, or the legal signification and effect of those words. This question is so well settled upon authority that we shall not refer to the several cases, but to the 2 U. S. Dig., pp. 294 to 307, secs. 2023 to 2305, for a reference to authority fully establishing the position assumed. It will not be necessary to extend the examination. Ample reference will be found on the first page. The fact being established that it was not competent to show by proof that the note upon which this action is founded was payable in a currency other than is expressed in the note at the time the contract was made.

Then was it competent for the Legislature or Convention, by a law or ordinance made after the contract took effect, to prescribe a new rule by which the rights and liabilities of the parties are to be determined, and by the new to vary or abolish

the rule in force at the time the contract was made, and by this means impair the obligation of contracts. It is believed to be well settled upon authority that it was not competent for the Legislature to make a law impairing the obligations of contracts in force at the time of enacting the law. This, it is believed, was first held by the Supreme Court of the United States in the case of Fletcher v. Peck, 6 Cranch, 139. The law as announced in that case, decided in 1810, has not been questioned by any court, that I am aware of, to the present time. And in the late case of Von Hoffman v. The City of Quincy, decided in December, 1866, and reported in 4 Wallace, 535–555, there is a reference to the authority on this question so full as not to require the citing of others than are there referred to.

It is in this case held " that the laws which subsist at the time and place of the making of the contract, and when it is to be performed, enter into and form a part of it as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge and enforcement." An examination of the cases referred to in this opinion will show that it has been held from the case of Fletcher v. Peck to the present time, that if the law had the effect to defeat or impair the remedy it is as objectionable as if it defeated or impaired the contract.

The cases, or the larger number of the cases, to be found on this question, are founded on acts of Legislatures. Does it change the rule that the ordinance now under consideration is the act of a convention who were elected and convened for the purpose of framing a constitution for the State? The act of the Legislature and the ordinance enacted by the Convention are both rules prescribed, and if not in conflict with some provision of the constitution of the United States, are laws. (1 Blackstone's Commentaries.)

We submit that if any provision of the constitution or ordinance enacted by the Convention are in conflict with powers

expressly delegated to the Congress, then the constitution or ordinance so in conflict is void. A law which should change the rule as to what is evidence, and allow facts to be proven at the time of the trial which could not have been proved at the time the contract was agreed to, does certainly change the rule; and when the effect of such change of rule is to impair the obligation of a contract, it is submitted that such rule, whether it be found in Acts of a Legislature, constitution or ordinance, to the extent that it conflicts with the constitution of the United States, is void. And it is submitted that the Ordinance of 1866, above referred to, by which the rule before existing in regard to testimony is changed, that the rule as changed by which certain facts are permitted to be given in evidence which was not admissable at the time the contract was made, and by which the contract is rendered less valuable than before the change of the rule, does in fact impair the obligation of the contract, and is void.

*M. Priest* and *S. A. Wilson*, for appellees.

I. The contract sued upon was illegal and void, and can not be enforced by the courts, for the reason that by the agreement and understanding of the parties to said contract, at the time the same was entered into, it was to be paid off and discharged in *Confederate money*. The defendants could legally present this defense by plea, which they did, and whether they pleaded this defense or not, if the facts of the case developed in evidence had shown it, the court would not enforce the contract. The court below, therefore, ruled correctly in overruling the plaintiff's exceptions to defendants' pleas. In the case of Smith v. Smith, decided by this court at Austin, opinion delivered by Chief Justice Morrill, the court says: "The principle of public policy is this, *ex dolo malo non oritur actio*. No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If from the plaintiff's own stating, *or otherwise*, the cause of action appears to arise *ex tempo causa*,

XXXII--3

or the transgression of a positive law of this country, then, the court says, he has no right to be assisted." The case at bar is certainly one in which the contract was illegal and treasonable. The proof shows clearly that the note was to be paid in *Confederate money.*

II. The note was transferred by delivery *after maturity,* and subject to the same defenses in the hands of appellant that it would have been subject to in the hands of the original payee. (O. & W., art. 87; Story on Promissory Notes, § 190.)

III. The court below ruled correctly in sustaining exceptions to plaintiff's amended petitions. He sued upon a written contract, and by that he was bound, and could not be permitted to abandon it and claim upon a *quantum valebat.* (O'Conner v. Van Homme, Dallam, 429.) The original contract being void because of illegality, the court would not lend its aid either in enforcing or rescinding it, and if the plaintiff would not be permitted to recover upon the written contract, he certainly would not be permitted to recover *quantum valebat.* The parties being *in pari delicto,* the law leaves them as they were. (2 Parsons on Contracts, 252, 253; Smith on Contracts, top page 203 and note a.)

IV. J. M. Brittain, the payee of the note, was a competent witness, and the court properly admitted his testimony. (Parsons v. Phipps, 4 Texas, 341; Hillebrant v. Ashworth, 18 Texas, 307; Gould v. Beal, 24 Texas, 665.)

HAMILTON, J.—In this and other cases now pending in this court in which suits were brought upon written obligations for money, without specifying either coin or currency, the defense has been interposed that the real undertaking was to pay in Confederate money, or that the consideration for which the obligation was given was for the obligations of the Confederate States, usually called Confederate money. There would be no difficulty in the expression by the court of a unanimous opinion if the facts pleaded in the several cases appeared upon the obligations sued on. There is, however, a difference of

opinion as to the admissibility of such a plea, and of parol proof to sustain it.

The rule contended for by Mr. Justice Lindsey is, I think, too stringent, even in its application to written obligations legal in their character, and altogether untenable when the contract is illegal.

There can be no controversy as to the general principle of the admissibility of extrinsic evidence to explain written instruments. The uncertainty and ambiguity of wills have furnished a vast number of examples of the necessity of resorting to this rule for their true interpretation.

Wigram on Extr. Ev., 59, lays down this proposition, as deduced from the English cases: " Every claimant under a will has a right to require that a court of construction, in the execution of its office, shall, by means of extrinsic evidence, place itself in the situation of the testator, the meaning of whose language it is called upon to declare;" and in the preceding page says: " there seems to be no material distinction between wills and other instruments in this respect." This principle applies also in case of uncertainty as to the subject or object of a deed, as, for example, where an estate is conveyed by a particular name, there must be evidence to show what land is known by the name used.

The *general* rule that all parol agreements and negotiations touching the subject matter of a written contract between the parties, anterior to or cotemporaneous with the execution of the instrument, are to be regarded as merged in it, is admitted.

But the case under consideration furnishes, I think, by long and well established authority, a notable exception to this general rule. There is no difficulty in understanding the reason why the general rule does not apply to subsequent agreements by parole changing or varying the terms of the written contract; they are not within the rule because they did not exist at the time the written contract was entered into, and therefore could not be included; the law regarding the written instrument as embracing the entire contract as understood at

the moment of its execution. But this is only predicated of contracts legal in their character, and the rule cannot be invoked to cover, protect, enforce or give effect by judicial sanction to such contracts as may be shown by extrinsic evidence to have been entered into contrary to public policy, to public morals, or other cause which, if expressed upon their face, would stamp them with illegality.

In Cowen & Hill's Notes to Phil. Ev., part 2, note 304, it is said : " The rule confining the operation of parol evidence within the limits of strict exposition or interpretation assumes that the instrument has a legal existence and is valid." " Testimony, to show it to be void, is always pertinent, no matter who are the parties or in what court the question arises." " Deeds, however, can not be avoided on all the grounds which apply to simple contracts. Hence, what might be a relevant enquiry as to the latter would not necessarily be in respect to the former. But in regard to *illegality* of consideration, both will usually be found to stand upon the same footing in this particular."

It is not my purpose (because it is not necessary in this case) to discuss the correctness of the proposition with respect to deeds. There are, however, a number of respectable authorities in its support. In the case of Dale v. Rosevelt, 9 Cowen R., 310, a deed was avoided upon proof that the consideration was simonical; and in other cases where the consideration was the sale of an office; money won at play; or generally for anything either *mala in se*, *mala prohibita*, contrary *to public policy*, etc., etc.

So it was expressly held in the case of Phelps v. Decker, 10 Mass., 274. In that case it was broadly laid down "that by the common law deeds of conveyance or other deeds made contrary to the provisions of a general statute, or for an unlawful consideration, or to carry into effect a contract unlawful in itself, or in consequence of any prohibitory statute, are void *ab initio*, and may be avoided by plea; or on the general issue *non est factum* the illegality may be given in evidence."

But this in a later case (11 Mass. R., p. 375) has been over-ruled, and the position assumed that a deed of conveyance could not, as such, be avoided by a party on the ground of having been made in consideration of a felony having been compounded.     But the distinction is clearly drawn between bonds and contracts *sought to be enforced* and *actual convey-ances* of lands or other property.

It is admitted that the former may be avoided, but the latter, it is said, "are to be treated in all cases as actual trans-fers, so far as the immediate parties are concerned, and governed by the same rule as the payment of money or the delivery of a chattel."

That this case lays down the correct rule I am well satisfied. The principle inflexibly observed in such cases is that courts will neither aid in the execution of an illegal executory con-tract nor relieve a party who has executed it.     A deed is not a bond or simple contract which remains to be executed, but is a thing done, and when done contrary to the prohibitions of the law, or when it consummates an illegal contract, the law leaves the party executing it to the consequences of his illegal act. And for this very reason it is that courts will permit the defense of illegality to be made; not certainly for the purpose of aiding or benefiting the defendant, but because they will not be instruments in their execution.

In the case of the Inhabitants of Worcester v. Eaton, 11 Mass., just referred to, the court, after reviewing at considera-ble length the English authorities upon the subject, state the result in this language: "It appears, then, to be the settled law in England, and we are satisfied that it is also the law here, that where two parties agree in violating the laws of the land, the courts will not entertain the claim of either party against the other for the fruits of such an unlawful bargain. If one holds the obligation or promise of the other to pay him money, or do any other valuable act, on account of such illegal transaction, *the party defendant may expose the nature of the transaction to the court*, and the law will say, ' our forms and

rules are established to protect the innocent and to vindicate the injured, not to aid offenders in the execution of their unjust projects;' and if the party who has foolishly paid his money repents his folly and brings his action to recover it back, the same law will say to him, 'you have paid the price of your wickedness, and you must not have the aid of the law to rid you of an inconvenience which is a suitable punishment of your offense.'"

The law and the courts which administer it are entirely indifferent as to which of the parties to an illegal contract is the loser—one or both, it matters nothing. If it be a suit to recover money paid, a chattel delivered, or real property conveyed by deed, upon an *illegal* consideration, the rule is the same as if the contract had been executory and the action was to compel payment, delivery or conveyance; in either case the halls of justice are closed to such a litigant. This view of the question, it seems, is not satisfactory to some very able and very just minds, because it permits a party to plead his own wrong or infamy, as the case may be, and thereby obtain an unconscientious advantage over his adversary, from whom, perhaps, he has received some valuable consideration for the execution of the instrument, the payment of which he resists. This is undoubtedly true; but it is equally true that the law does not undertake in such cases to settle any question of conscience as between the parties. The courts are called upon to perform a higher duty than to settle questions of honor between wrongdoers; they are to protect society from the influence of contracts made in disregard of morality—the public weal from suffering detriment on account of obligations executed in violation of law; and to sustain, defend and protect the Government in its full integrity against any agreement, undertaking or promise, which is founded in whole or in part upon or in consideration of anything which expressly or impliedly, or directly or indirectly, denies its full and complete authority as sovereign over this and all the other States of the Union. The parties to such a contract are presumed in law to know its

character when they enter into it.   If they speculate upon the chances of the failure of the Government whose laws they disregard and whose authority they contemn, they must now learn at least the law can not respect that which is illegal, and that courts will never give effect to a contract which looks, however remotely or contingently, to the destruction of the Government.

This character of case is very unlike that in which a party seeks to recover back property, or to evade the payment of money, which was conveyed or promised fraudulently as to creditors.   In the latter case there is no violation of law in the act itself; that is to say, the contract is not illegal as between the parties, but only as to creditors, who may take advantage of it.

The thing conveyed or promised is legally the subject of contract, and whether with or without consideration may be sold or promised, and when the question of recovering back property thus conveyed or resisting the payment of money promised is raised, the party who conveyed or promised will not be heard to plead his intention to defraud his creditors. Society has no interest in protecting him against his intended fraud upon his creditors, but the very reverse, and so the rule is that he shall not be permitted to deny his act.

The difference is that in the one case the *subject matter of the contract is illegal*, and the contract can not, therefore, be enforced; whereas in the other the subject matter is *legal*, and the contract enforced as a penalty for an intended fraud upon third parties.

Now it is admitted by those who differ with me on this question that if the character of the agreement as pleaded appeared upon the face of the instrument, there could be no question in that case of its viciousness and condemnation. I have stated the *general* rule to be that the operation of parol evidence in cases of written contracts is confined within the strict limits of exposition or interpretation, but have at the same time shown that this rule is based upon the assumption

that the instrument has a *legal* existence, and is valid.   This position will be found most amply sustained in the following cases: Mann v. Eckford's Executors, 15 Wendall, 518; Parker v. Parmalee, 20 John R., 134; Vrooman v. Phelps, 2 John R. 177; Paxton v. Popham, 9 East., 408.   See also the authorities to which these decisions refer.

This is also the rule laid down in 1 Story on Contracts, § 541.

These authorities, in deciding that the real nature of the transaction may be shown, as it respects the parties to the contract, applies only where the contract is in some way sought to be enforced, or while it remains executory.   " A party to an illegal transaction is not allowed by the allegation of his own turpitude to recover back what, in pursuance of a forbidden bargain, he has delivered to the other party, or in any way to avoid the bargain when once executed;" to such cases the maxim *in pari delicto portio est conditio defendentis et possidentis* applies.

These authorities from the ablest elementary authors, and opinions in numerous cases by courts of the highest character, are not, so far as I have seen, seriously controverted anywhere, and I must regard their exposition of the law upon the question as the true one.

Mr. Justice Lindsay, in his opinion in this case, has made reference to the seventh section of Ordinance No. 11 of the Convention of 1866, which he supposes is relied on by the defendants below to authorize the plea of illegality.   The section provides that " in all suits now pending, or that may be hereafter instituted, upon contracts in writing made since the 2d day of March, 1861, and prior to the 2d day of July, 1865, payable in ' dollars and cents,' parol testimony may be introduced to show that dollars in Confederate or other paper currency were intended, and the marketable value thereof at the time of maturity; and the same rule shall obtain when such currency was the consideration of a contract which is otherwise valid."

I do not know how far the defendants below relied upon this section of the ordinance to support the plea; but this I do know, that it is entirely without reference to this ordinance or any part of it that I regard the plea as good; and I agree with my learned brother that the section quoted is in its letter and purpose in conflict with the constitution and laws of the United States, but I can not concur in his view of the particular provision of the constitution with which it conflicts, to wit: the last clause of the tenth section of the first article, which, among other things, prohibits the States from passing any "law impairing the obligation of contracts." It must be admitted that his view of the constitutional objection is consistent with the position which he maintains of the legality of the contract sued on against all extrinsic proof.

It is impossible to know what was in the mind of the Convention precisely; but I think it may be assumed that they intended, as far as they had the power, to authorize the fact of Confederate money as the consideration of the contract or its payment in discharge of an obligation to be pleaded, and its value to be assessed at the time of maturity, etc.; and that the effect of this should be to limit the recovery to its value in current money. Of course, if my learned brother be right, then this authority to plead the fact would be repugnant to the constitutional provision to which he has referred, provided the rule of construction for which he contends touching the validity of the instrument is itself under the protection of the constitution, so that it can not be changed or in any manner altered. The view which I have taken of the case avoids this latter inquiry. I regard *legal* contracts, and none others, as being the subjects of protection under the constitution of the United States from State interference, and cannot conceive that an *illegal and void* contract can either be protected by the one or impaired by the other. The seventh section of the ordinance is in conflict with the constitution because it assumes to give validity to *illegal* contracts, not because it seeks to impair those that are *valid*, and because it seeks to give value to the

promises of a confederation of States entered into in hostility to the national authority and for its final overthrow, which promises were illegal and treasonable in their character, and are not susceptible of being validated by any power in the Government.

The judgment is affirmed.

Lindsay, J., dissenting.—The defense set up in this action is wholly untenable, and ought not to have been entertained by the court, in my judgment.

The legal defenses which may be plead and relied upon to defeat a recovery upon any written obligation, which does not exhibit upon its face, or in its terms, an illegal or vicious consideration, though quite numerous, are well defined in law. Those defenses are: in covenants, performance, or a release; in obligations to pay money, payment, accord and satisfaction; the substitution of a bill of exchange for the demand; another action depending, or a judgment already recovered for the amount; an arbitration and award; a tender; the statute of limitations; a set off; infancy; coverture; bankruptcy; fraud, or mistake in the execution of the instrument sued on; and a failure, or partial failure, of consideration; or no consideration. All these defenses may be plead to an illegal contract, as most of them may be plead to all other contracts, as well as to a vicious one.

The instrument sued on in this case shows no illegality, or viciousness of consideration upon its face, or in its terms. For aught that appears from the instrument itself, it exhibits nothing but an honest, fair transaction; and from the answer to the petition, it seems to have been founded upon a meritorious and valuable consideration—the purchase of a steam mill. I can perceive nothing illegal in the contract, nor vicious in the consideration. This is the only defense relied upon in the answer; and it is insisted that there was an agreement, or implied understanding, *dehors* the written obligation, that the note was to be paid off and discharged in some other manner than its terms import.

The principle has been too long and too well settled, according to my understanding of the law, to be now brought into debate, here or elsewhere, that where there is no ambiguity in the terms of the instrument, the instrument itself shall be its own interpreter, and the only criterion of the intention of the parties. This principle totally excludes parol evidence to contradict the writing itself, although the evidence might clearly show, "that the real intention of the parties was at variance with the particular expressions used in the written agreement." This principle obtains, both in law and in equity. The exceptions, therefore, of the plaintiff to the answers of the defendants, ought to have been sustained; and all parol evidence, upon such a plea, excluded on the trial. This case, as it seems to have been supposed, is not analagous to that of Smith v. Smith, decided at Austin by this court at its late session. In that case the illegality of the contract, and the turpitude of the consideration were apparent upon its face; and the decision was but a conclusion of law upon the written contract of the parties themselves, and required no proof *aliunde*.

There can be no doubt that this contract, as disclosed by its own terms, was a legal and valid contract, by the laws of the land, at the time it was entered into by the parties; that the purchase of a steam mill by the one, and the execution of a promissory note by the other, to pay a stipulated sum in money, on a given day, was a contract mutually binding, and was such an one as was enforcible in a court of justice; and when the steam mill, the consideration for the note, was delivered to the obligor, his obligation to pay was fixed irrevocably. Both a moral and legal obligation was then imposed upon the promisor, who selected his own witness of the contract, in the execution of the note, which he delivered to the promisee; and he should not be allowed now to discredit his own witness, by attempting to prove that he himself had only promised to do an illegal act, and to invoke the court to uphold him in taking advantage of his own wrong.

The obligation of the contract, then, being both moral and

legal, and binding upon the promisor, in receiving a benefit from the promisee, by the delivery, on his part, of the steam mill—which was in violation of no law, common nor statutory, State nor Federal—I can conceive of no valid reason why it should not be enforced, as the parties have made it, when there is no allegation of fraud, nor mistake in its execution. I readily concede that a contract, to be performed by the payment of Confederate money, as it is called, was, and is, illegal, and such a contract now can have no standing in court. But is this such a contract? So to consider it, would be to adopt a rule of construction and of judicial investigation which would subject the court to the animadversion of its own rule of interpretation. It would give this currency a standing in court which would make it available as a matter of defense, in derogation of the principle which proclaims its illegality. It can not be said that the parties are in *pari delicto*, and therefore the court will not interfere, but leave the parties where it found them. "The presumption of the law is always in favor of the legality of a contract; and therefore, if it be reasonably susceptible of two meanings—one legal, and the other not—that interpretation shall be put upon it which will support and give it operation." (See Chitty on Con., 571.) Adopting this rule of construction, and admitting that the word "dollars" may mean Confederate dollars, in popular acceptation, it may also mean Federal dollars, the legal currency of the country; and this is the true rule of construction; and the aid of parol testimony is not needed to settle a question which is already solved by the rules of law. The plaintiff in the action does not found his claim upon an illegal act. The note sued on is perfectly legal in all its terms; the consideration for which it was given is also strictly legal. Certainly the promisor, merely telling him, the promisee, that he would pay it in Confederate money; and even his, the promisee's, subsequent assent thereto; or his saying, in the progress of the negotiation, that he would take Confederate money; and the subsequent reduction of the contract to writing, in a perfectly legal form, can not constitute

an illegal contract, such as the law denounces. The terms of the contract are legal; the consideration is legal, and there is nothing makes it illegal but the necessity of the defense to evade its payment. The defendant only lacked forecaste and wisdom, and indulged an overweening confidence in his sagacity about future events; and it may be, he confidently anticipated that he would ultimately pay the debt in Confederate money, and did not care to make a contract for Confederate money. which, in certain contingencies, would be a violation of the public policy and the laws of the United States. As the parties themselves chose this course, whatever may have been the mental reservations of either, they did not in fact make an illegal contract. And as human laws only take cognizance of the actions of mankind, and not of their thoughts and intents, we must content ourselves with scanning those acts in the light of reason and of law, and determine their nature and character by their final manifestations, which, in this case, eventuated in the legal obligation sued upon. I think the party himself is not to be heard in such a defense, unless the 7th section of Ordinance No. 11 gives him the right to be heard. Irrespective of that ordinance, the view I have taken would seem to settle the rights of the parties in this litigation definitively. But for a full determination of the matters involved in this investigation, the necessity seems to me to arise that it ought to be considered what is the force and effect of that ordinance upon the private rights of the citizens of the State, arising out of contracts theretofore made.

By the 7th section of that ordinance it is provided that, "in all suits now pending, or that may hereafter be instituted, upon contracts in writing, made since the second day of March, A. D. 1861, and prior to the second day of July, 1865, payable in dollars and cents, parol testimony may be introduced to show that dollars in Confederate, or other paper currency, were intended, and the marketable value thereof at the time of maturity; and the same rule shall obtain where such currency was the consideration of a contract which is otherwise valid."

It is upon this section of the ordinance, as I suppose, as a provision of law, that the defendants expected to make their defense available. This necessarily raises the question of the power of the Convention to pass such an ordinance; or, rather, it involves the inquiry, whether such a provision is not in conflict with the constitution and laws of the United States, and in its terms impairs the obligation of contracts entered into between parties, and by them reduced to writing. We know that the opinion but too generally prevails, in the popular mind, that Conventions in a State are unlimited in their powers, omnipotent in action, and wholly unrestrained and uncontrolled, except by their own wills, and their own sense of what are the requirements and the necessities of political society. This, however, is a popular fallacy. In a Republican government this theory is a true one when applied to the nation. But not so of a State, with only a separate municipal government, but forming an integral part of the nation, which, as a head, controls it as one of its members. Such is this nation, and such is the control it rightfully exercises over the individual States composing the National Government. A Convention of a State can no more act independently of that government than the Legislature of a State. The constitution of the United States, the joint product, according to the theory of our political system, of the wills and minds of every citizen of the nation, declares, " This constitution, and the laws of the United States, which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding." Thus, State Conventions are under the control of the nation in making constitutions, as well as their Legislatures in enacting laws. Does the Ordinance No. 11, of the Convention of 1866, impair the obligation of the contract between these parties? It will not be denied that the Convention, or the Legislature may alter, change, or modify any rule of

evidence; but in doing so, it must keep within the pale of its authority, and neither directly, nor indirectly, make void, or lessen and diminish, the protection to the private rights of the citizen, intended to be afforded by that constitutional provision which declares, in the 10th section of Article 1, that "no State shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make anything but gold and silver a tender in payment of debts; pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, or grant any title of nobility." It is needless to refer to authorities to show that it has been repeatedly adjudicated, both by Federal and State courts, that if, in changing or modifying the legal remedies in force at the time of the making of a contract, the rights of parties are abrogated, lessened, or diminished, such change, alteration, modification, or repeal of the remedial laws, comes within the prohibition of this clause of the constitution, and is null and void. This point was adjudicated at the last session of this court, at Galveston, in the case of Jones v. McMahan & Co., and needs no further elaboration in this opinion. What is the effect of the ordinance upon the rights of the plaintiff in this action? Inevitably to lessen the amount of his claim as agreed upon by the terms of the contract, and therefore impairs the obligation of the contract. For what was this ordinance passed, if it was not to afford parties an opportunity of lessening and diminishing the extent of their liability? It had this object, and none other, and comes clearly within the scope of the mischief which this provision in the constitution was designed to remedy, and is therefore void. I am of opinion the answers of the defendants, presenting such a plea as a defense to the action, ought not to have been heard, and the plaintiff's exceptions to them ought to have been sustained.

Wherefore, in justice to my own convictions, I am constrained to announce my dissent to the judgment of the court delivered in this case.