COLUMBIA ENGINEERING INTERNATIONAL, LTD., Appellant,

v.

James M. DORMAN et al., Appellees.

No. 8324.

Court of Civil Appeals of Texas, Beaumont.

April 17, 1980.

Rehearing Denied May 15, 1980.

John H. Benckenstein, Beaumont, for appellant.

Joe H. Tonahill, Jasper, for appellees.

DIES, Chief Justice.

Sometime prior to March 1974, the Kirby Lumber Corporation (hereafter Kirby) acquired a plant (Evans Co.) across Highway 92 (east side) from its mill in Silsbee with the intention to build in its place a particle board plant. The consulting engineer for the plant was Columbia Engineering International, Ltd. (hereafter Columbia). The general contractor was Casey Enterprises, Inc. (hereafter Casey). McBride Steel Erection Corp. (hereafter McBride) was a subcontractor fabricating steel. Minnis Erection Corporation (hereafter Minnis) was a subcontractor and dismissed from the case on summary judgment. United States Fidelity and Guaranty Co. (hereafter United) was intervenor.

Next to the east side fence of the newly acquired property Gulf States Utilities Company (hereafter Gulf States) owned and maintained a high voltage tower, and the lines extended across Kirby's fence and over its property.

### Part I

On March 4, 1974, James M. Dorman and Walter W. Blackshear—ironworkers, employees of McBride—were assisting in the unloading of prefabricated steel near this east fence. This steel was "hooked" on both ends from the truck on which it was delivered by cables from a "cherry picker" with a "telescopic" (movable) crane or boom. The operator of the crane, Flowers—also a McBride employee—would then swing the steel off the truck and lower it to the ground. Dorman and Blackshear "guided" the steel, one at each end, holding the apparatus attached to the cable. On this date (March 4, 1974), the crane came into contact with Gulf States' power line causing 15,000 volts of electricity to flow through the cable and the bodies of Dorman and Blackshear, both of whom were horribly and permanently injured.

A suit resulted in which Dorman and Blackshear were plaintiffs below.

Shortly, prior to trial, Dorman and Blackshear settled their cases with Kirby, Gulf States, Casey, Minnis, and United for four hundred thousand dollars ($400,000). Suits for contribution and indemnity flowed between the settling defendants and Columbia. After a lengthy trial, a jury found Columbia one hundred percent negligent and awarded Dorman and Blackshear substantial damages. Additionally, the trial court decreed that Columbia should respond to their cross-actions for indemnity and ordered Columbia to make them whole for the four hundred thousand dollars ($400,000) they had paid in settlement prior to trial to Dorman and Blackshear. It is from this judgment Columbia has perfected this appeal. For clarity, the parties will be referred to in this opinion generally by name.

Columbia's first point is that "[t]he trial court erred in admitting into evidence the testimony of . . . Dorman, that he assumed that [Columbia's] Engineer, . . . or someone from Columbia indicated to him and Blackshear, to place the steel beams

against the fence where the accident occurred, over [Columbia's] objection that such evidence was hearsay, speculative and not based upon fact."

Herb Moss was Columbia's main supervisor and engineer on the work site. On March 4, 1974, Dorman and Blackshear began unloading the steel dunnage further from the fence referred to herein and further from the power line. Dorman then testified his foreman (Milton Nanny, Sr.) came to him and ordered him to move the steel closer to the fence (and therefore the power line). Dorman at first refused, but Nanny, Sr., insisted saying, "Because Mr. Moss says there is going to be a little building come out here and it's going to be in the way." This evidence did not derive its probative force from the competency and credibility of Dorman and was, therefore, inadmissible as hearsay. See the many authorities cited in 24 Tex.Jur.2d *Evidence* § 557 at 51 (1961); also see 24 Tex.Jur.2d *Evidence* § 560 at 57 (1961).

■ However the trial court ruled: "[T]hat portion of the testimony is stricken," and "The jury is admonished not to consider it for any purposes of what Nanny told him that Moss said." "This therefore cures the error." 1 C. McCormick & R. Ray, *Texas Law of Evidence* § 29 (Texas Practice 2d ed. 1956). This point is overruled.

We believe this appeal will be better understood if we next take up Columbia's Points 6 through 11. These points contend the findings of negligence and proximate cause against Columbia are supported by no or insufficient evidence or are against the great weight and preponderance of the evidence.

We review these points under the guidance of *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965), and *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

Dorman testified he saw Nanny, Sr. (his McBride supervisor) and Moss talking. He than saw Moss point to the dunnage (on which the steel was placed) and then "pointing  .  .  .  to move it over to-

wards the fence." Nanny then came over the told Dorman to move it. He (Dorman) testified Moss gave "us the highball" which means he wanted the dunnage and steel placed next to the fence (and power line).

Herbert Moss began working for Columbia in June 1973 on loan from another company. He was a consulting engineer and "had to coordinate the work [at Kirby]." He inspected the work and then would certify to Kirby the amount of work that would be done by each contractor. It was on this basis Kirby paid the contractors. Friday before the accident, Nanny, Sr. (McBride foreman) asked Moss if he could unload the steel at the south end of the blending building. Moss answered, "I told him I had no objection to him unloading that steel there, but to watch that high power line above.  .  .  ." The blending building was sixty or seventy feet from the east fence (and hence about that much farther from the power line). However, Moss said Nanny was going to unload "[a] little southwest of the blending building, [w]hich would be by the fence"; to which Moss had no objection when asked by Nanny, Sr. He denied telling Nanny, Sr. "where to locate this steel at a fenceline on Monday," but he "wasn't surprised that they unloaded it over there." He didn't know Nanny, Sr., was doing this or he would have stopped it and, "Yes, sir, I had the authority to stop him.  .  .  ." On examination by Kirby's attorney, Moss admitted the hazard would have been the same whether the steel was unloaded at the Friday or Monday location. Kirby knew nothing of the unloading. Kirby was relying on Moss "as the construction supervisor." Moss thought Columbia was a little unfair in not providing him with more help. He took no action to de-energize this power line. Columbia represented Kirby insofar as safety was concerned in dealing with the contractors. Had he been furnished more help by Columbia "probably" this wouldn't have happened. He was asked, "Well, it was a joint thing between you and Nanny [where to unload the steel]." To this he answered, "Well, in a way." He was asked, "do you think the steel was laid in an unsafe spot?" To which

he replied, "no doubt about it." He admitted he had the power under the contract to direct the site of unloading.

Nanny, Sr., testified the day the accident happened he decided where the steel was to be stacked, "but prior to that Herb Moss and myself had talked about it, and he said that [he] agreed to it."

McBride testified Columbia was to supervise the job.

Both Dorman and Blackshear understood Moss was "over the whole job." Blackshear had been previously ordered by Moss to move a shack.

Jack Arnold Hickman, general foreman for Casey, was asked:

"Q. In other words, he [Moss] was the supreme decision maker so far as the work that went on in this project?

"A. Yes sir.

"Q. Did that go on from the time you went on the job until you left?

"A. All the time I was out there.

*     *     *     *     *     *

"Q. Whatever he said you all went by it?

"A. Yes sir.

*     *     *     *     *     *

"Q. Now, who, between those two gentlemen [Nanny, Sr., and Moss] would have the decision making authority where to locate that steel?

"A. I would say Mr. Moss."

Robert Allen Sheffield, superintendent for Gulf States, testified he had received no request to de-energize the power line in question, and, if one had been made, it would have been de-energized; that such a request would have been a normal procedure; that they (Gulf States) frequently get such requests, or to provide insulating devices.

Harlan Walker, resident manager for Kirby, contracted with Columbia for the supervision and inspection in determining how and what and what means were employed in getting the job completed and performed. Moss "was in charge of all operations of the contract." It was Columbia's responsibility, the witness said, to get the line de-energized or protected with a shield. Kirby relied on Columbia to deal with the contractors and see they did their work safely and properly. Columbia "did the construction managing." The general conditions of the contracts were drawn by Columbia. If there were contract disputes between the contractors, or emergencies so that the work needed to be stopped for safety, it was Columbia who resolved it. All changes in plans were made by Columbia. It was Columbia's responsibility to provide safety precautions. If McBride or Nanny, Sr., had come to him asking to unload steel at such and such a place, "I would say they would have had to have seen Herb [Moss]." The coordination of unloading the steel in a safe manner was Columbia's. Kirby relied on Columbia to give any warnings of danger to Dorman and Blackshear.

Richard Flowers, the crane operator, testified that where the steel was unloaded on Friday, the power line was not over the crane. It was Nanny, Sr., he said who told him to move the crane on Monday (the day of the accident). He did not see the cable contact the line, only heard the "pop." The man on the truck was the one who gave him the signals. Dorman and Blackshear had "Their head[s] down and their tail[s] up" unloading the steel.

James C. Dillahunty, an electrical contractor, was examined by all parties concerning the meaning of the written contracts.

The two contracts referred to in this opinion are attached to this opinion. For identification in the following observations we have marked them "A" and "B."

We note that contract "A" provides that Columbia:

1. "Complete construction supervision and liaison work with contractors and sub-contractors." (B.2)

2. "Liaison work with equipment suppliers and expediting of equipment deliveries." (B.6)

Contract "B" has these provisions:

1. "The Engineer [Columbia], being in the first instance the interpreter of the Contract and the judge of its performance, shall use powers under this Article to enforce faithful performance of the Contract by both parties hereto. . . ." (3a)

2. "Time is of the essence for the Contract and if any time . . . machinery or equipment or any of its methods of executing the work appear to the Engineer to be unsafe . . . the Engineer may order and direct the Contractor to improve. . . ." etc. (3b)

3. "The Engineer shall decide on questions arising under the Contract Documents. . . ." (4a)

4. "The Contractor under the direction of the Engineer shall be responsible . . . for unloading . . . all materials. . . ." (18b)

5. The Engineer has authority in an emergency to stop the progress of the work whenever in its opinion such stoppage may be necessary to ensure the safety of life. . . ." (34a)

We believe the evidence we have summarized above sufficiently supports the jury's answers to Special Issues Nos. 1 and 2 (negligence and proximate cause of Columbia) and, therefore, overrule Columbia's Points Six through Eleven.

We now take up Columbia's Points Three through Five. These points urge error by the trial court in permitting testimony of James Brennan that the contract between Kirby and Columbia placed the burden of safety operations upon Columbia; allowed Brennan to interpret a written contract in violation of the parol evidence rule; that Brennan was not qualified to render an interpretation; and that Brennan should not have been permitted to testify Columbia violated the requirements of the Occupational Safety and Health Administration.

Columbia cites *Henry v. Phillips*, 105 Tex. 459, 151 S.W. 533, 538 (1912); *Soel v. Hadden*, 85 Tex. 182, 19 S.W. 1087 (1892); *Donley v. Tindall*, 32 Tex. 43 (1869); *Smith v. Jefferson County*, 41 S.W. 148 (Tex.Civ. App. 1897, no writ); and *Polk v. Inman*, 211 S.W. 261 (Tex.Civ.App.—Texarkana 1919, no writ), for the propositions that parol evidence is inadmissible to show the construction to be placed on a written contract where there is no ambiguity in the contract, and the intent of the parties may be ascertained therefrom, and, where a written agreement was unambiguous, testimony of an expert witness to explain it was properly excluded. We have no quarrel with these general propositions as being Texas law.

James J. Brennan is a professor of industrial engineering at Lamar University and a consulting engineer, with a degree in electrical engineering and a Ph. D. in mechanical engineering from the University at Austin. He testified he was familiar with the type of program that went on between Kirby and Columbia in the building of the particle board plant. He said in such an undertaking it was common for the owner to employ a consulting engineer, and that he had served in such function. He read Section 3a (of Exhibit B, the contract between Kirby and McBride) and said that "as an engineer and having been involved in construction, this paragraph puts the burden on Columbia Engineering of acting in Kirby's best interest. . . ." He interpreted 3b to mean Columbia had the power to ascertain the contractors operate safely "and this is the way these contracts are usually drawn." He also testified that paragraph 10a of the contract gave Columbia supervisory responsibility to make certain the contracts observed all laws including O.S.H.A.; that the contractor violated certain of these rules. He said that paragraph 18b of the contract made the contractor under the direction of the engineer responsible for unloading materials supplied.

Columbia put on much of the same type testimony through Eugene Nemeth, vice president of Columbia, also an electrical engineer. Columbia prepared all plans and specifications including electrical. He was project manager before Moss arrived. He was asked by Columbia's attorney, "Now, you know the contract that was made between Columbia and Kirby . . .?" He

answered, "Yes, I do." Then his attorney asked, "What is your understanding of what that contract required Columbia to do?" Over objection he answered, and it is interesting to note that part of his answer was ". . . some people may interpret certain points of it differently or the intent of the contract somewhat." He then interpreted the contracts, both Exhibits A and B herewith attached, in much the same manner as the Lamar professor and sometimes over objection.

On cross-examination, he was often asked interpretative questions concerning Columbia's role in the contracts, without objection from Columbia's attorney. At one point he testified: "And our man on the job site, his responsibility was to make sure that Kirby's interest was carried out according to our drawings and specifications." He admitted that assuming Moss was at the accident site "and he would see that it's dangerous to the operation; yes, he would have the duty to shut it [the electricity] off." He based this on the contract. Casey's attorney was permitted to ask interpretive questions about the contract without objection.

In 2 C. McCormick & R. Ray, *Texas Law of Evidence* § 1681 (Texas Practice 2d ed. 1956), we find:

"Evidence offered strictly for the purpose of aiding in the construction of a written instrument is not within the prohibition of the Parol Evidence Rule."

The testimony of both the Lamar professor and Columbia's Nemeth really did not attempt to vary the terms of the contract but to give their understanding of the meanings of the words used, which is held permissible. Id. § 1687 at 542, 543.

In *Missouri Pacific Railroad Company v. Trautman Brothers*, 301 S.W.2d 241, 242 (Tex.Civ.App.—San Antonio 1957, writ ref'd n. r. e.), Justice Pope speaking for the court said:

"The explanation and interpretations of the terms used in the reports which were in evidence, were proper matters for expert opinion."

The question of the qualification of an expert witness is generally for the court. 23 Tex.Jur.2d *Evidence* § 207 at 318 (1964). We believe both the Lamar professor and Nemeth properly qualified.

At any rate, Columbia offered through Nemeth and permitted him to testify to essentially the same testimony the Lamar professor gave.

In *Medina Electric Cooperative, Inc. v. Ball*, 368 S.W.2d 227, 229 (Tex.Civ.App.— San Antonio 1963, no writ), Justice Barrow in speaking for the court wrote:

"The rule is well settled that the trial court's admission of evidence over objection is deemed to be harmless if the objecting party subsequently permits similar evidence to be introduced without objection [citing authorities]."

And see *Blakney v. Panhandle & Santa Fe Railway Company*, 381 S.W.2d 143 (Tex.Civ. App.—El Paso 1964, writ ref'd n. r. e.), holding a party could not be heard to complain on appeal of testimony as to speed of an automobile immediately prior to a collision, substantially same as evidence introduced by himself; and again, testimony substantially same as, and cumulative of that testimony, could not have caused the rendition of an improper judgment in the case (citing *Tex.R.Civ.P. 434*); see also, *Simmons v. Capital Diesel & Industrial Machine Works*, 380 S.W.2d 191 (Tex.Civ.App. —Amarillo 1964, writ ref'd n. r. e.).

"And, of course, a party is ordinarily estopped to complain of evidence presented by his adversary if he himself has previously introduced the same evidence or evidence of a similar character."

23 Tex.Jur.2d *Evidence* § 208 at 320–1 (1964). Columbia's "similar character" evidence was subsequent to the professor's, but we believe the rule would be the same.

As stated earlier herein the professor's evidence came in without objection through Nemeth. See *Esteve Cotton Company v. Hancock*, 539 S.W.2d 145, 159 (Tex.Civ.App. —Amarillo 1976, writ ref'd n. r. e.).

"[T]he appellate court will not order a reversal because of the admission of improper testimony objected to when testimony to the same effect is permitted without objection.

*Slayden v. Palmo*, 108 Tex. 413, 194 S.W. 1103, 1104 (1917).

■ Columbia's Points Three through Five are overruled.

## Part II *

Columbia's Twelfth Point is: "The trial court erred in not applying the credit rule and reducing the judgment against appellant, Columbia, $400,000—in the amount of the voluntary payment made by appellees to Dorman and Blackshear." The Fourteenth Point is the same.

Columbia cites the recent case of *Deal v. Madison*, 576 S.W.2d 409 (Tex.Civ.App.— Dallas 1978, writ ref'd n. r. e.).

There plaintiffs, surviving husband and children of Betty Madison who died in an apartment house fire, first sued Travelers Insurance Company. Later Travelers filed a third party claim against Deal, the landowner, and Craycroft, the architect who designed the apartments. The trial court severed the third party claim. After severance, plaintiffs made a settlement with Travelers for $450,000. Plaintiffs released Travelers and also assigned Travelers an interest in their claims against Deal and Craycroft so that the net amount of any recovery on those claims should be prorated two-thirds to Travelers and one-third to plaintiffs until Travelers should receive $300,000. Plaintiffs also agreed to proceed within a reasonable time with prosecution of their claims against Deal and Craycroft, and Travelers agreed that its third party action should be merged with the claims asserted by plaintiffs. Plaintiffs intervened in the severed third party action, and the court redesignated the parties—Madisons as plaintiffs, Deal and Craycroft as defendants. Deal answered contending plaintiffs had been fully compensated for their damages and that under Tex.Rev.Civ. Stat.Ann. art. 2212a (Vernon Supp.1978) he was entitled to full credit for all previous settlements.

Meanwhile Travelers had dismissed its claim for contribution or indemnity against

* This Part II, not having gained the support of a majority of the court, is filed as a dissent.

Deal and Craycroft. Before trial, plaintiffs settled with Craycroft and dismissed him; later plaintiffs joined Deal Companies. Plaintiffs settled with the latter and dismissed it before trial. When the case went to trial the only active parties were plaintiffs and defendant Deal.

The jury found Craycroft 30 percent negligent; Deal Companies 5 percent; Travelers 20 percent; Deal 45 percent; and that plaintiffs' damages were $444,999. Plaintiffs had already received settlements from Travelers, Craycroft, and Deal Companies in excess of this sum.

Plaintiffs moved for judgment against Deal for the award of the jury; Deal urged plaintiffs had obtained full satisfaction by the settlements arguing in effect plaintiffs should take nothing.

In agreeing with the defendant the court carefully analyzed *Gettegno v. The Parisian*, 53 S.W.2d 1005 (Tex.Com.App.1932, holding approved); *Bradshaw v. Baylor University*, 126 Tex. 99, 84 S.W.2d 703 (1935); and *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764 (Tex.1964).

The court concluded in *Deal v. Madison*, supra at 414:

"These decisions had established the substantive law concerning the effect of settlement by less than all tortfeasors before comparative negligence was introduced by article 2212a in 1973. Payment by each settling tortfeasor reduced proportionately the damages for which the remaining tortfeasor was liable, and since the claimant was entitled to but one satisfaction of his damages, the remaining tortfeasor was entitled to have the aggregate amount of the settlements credited on the damages, so that recovery was limited in any event to the excess of the damages as found by the court or jury over the amount of the settlements, and if the damages were found to be no more than the amount already received, no further recovery was permitted."

The intent of *Tex.Rev.Civ.Stat.Ann. art. 2212a § 2* (Vernon Supp.1978), the court

said (Id. at 416), "is to apply the scheme of comparative negligence so as to require contribution from each defendant *in proportion to the negligence attributable to him*, rather than to require an equal contribution from each tortfeasor, as formerly required by article 2212, but still to permit the injured party only one satisfaction of his damages." (Emphasis supplied.)

And, the court held (Id. at 420):

"[T]herefore, a non-settling tortfeasor is entitled to deduct any amount paid in settlement from the amount of damages found by the jury. . . . Rather, we interpret subdivision (d) as giving full effect to the *Bradshaw* rule in the context of comparative negligence, so that the remaining defendants are permitted to share the credit for the settlement *in proportion to their respective percentages of negligence*, and, therefore, in proportion to their respective liabilities." (Emphasis supplied).

Clearly this case has no application to the instant case because the jury found Columbia 100 percent negligent.

In *T. L. James and Company, Inc. v. Statham*, 558 S.W.2d 856 (Tex.1977) (also relied on by Columbia), plaintiff sued a milk producers association and its employee, alleging the latter struck plaintiff's pickup from the rear, recovered a judgment, which was paid into the registry of the court. Plaintiff later sued the highway contractor for failing to station a flagman to warn vehicles approaching from the rear of stopped traffic in front of them. In denying the second suit, the court said (Id. at 868):

"Statham [plaintiff] could have brought suit jointly [against both defendants]. He did not do so. . . . No issue was submitted addressing the question of comparative negligence . . ."

We have no such situation in the case we review. See also *Clemtex, Ltd. v. Dube*, 578 S.W.2d 813 (Tex.Civ.App.—Beaumont 1979, writ ref'd n. r.e.).

In *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246 (5th Cir. 1979), we find:

"The encouragement of settlements is the final factor which must be considered in this case. Whether the plaintiff or any of the defendants are ultimately found to have made a favorable settlement, we will 'respect the aleatory nature of the settlement process. . . .' *Doyle v. United States*, 441 F.Supp. 701, 711 n. 5 (D.S.C.1977). If Dresser were allowed to reduce Leger's recovery against it by the dollar value of Leger's settlement, Dresser would be left to pay a small portion ($284,090.00 total damages minus $182,-331.05 settlement minus $99,400 for plaintiff's contributory negligence equals $2,358.95) of the total damages even though its negligence was the main contributing factor in causing them. *Thus, Dresser would benefit substantially from its intransigence or miscalculation in refusing to settle the case. We refuse to adopt an approach which would reward a defendant for refusing to settle.* If a party decides to try a case, it must be prepared to accept whatever benefits or burdens flow from its decision."

I would overrule the points now discussed, but the majority of the court has determined otherwise in the attached concurring opinion.

Part III

Columbia's Thirteenth Point contends "The trial court erred in ordering appellant to pay Kirby $200,000, Gulf States, $100,000 McBride $25,000. . . ."

■ *Tex.Rev.Civ.Stat.Ann. art. 2212a* (Vernon Supp.1978) does not provide for this situation, and we have found no authority on this subject. Nevertheless, it seems inequitable to us to require Columbia to pay for the settlements it had nothing to do with, and gained no advantage from. We, therefore, sustain this point and affirm that portion of the trial court's judgment in favor of plaintiffs and against Columbia, but reverse and render that portion of the judgment requiring Columbia to repay to the settling defendants.

The judgment of the court will be as announced in the "conclusion" of the concurring opinion.

KEITH, Justice, concurring.

We concur in the holding of the Chief Justice in Parts I and III of the foregoing opinion. We do not agree with Part II thereof and this concurrence, therefore, will be the controlling and majority opinion as to the matters herein discussed; and, we are authorized to state that the Chief Justice designates Part II of his opinion as his dissent in this cause.

We do not agree to an affirmation of a judgment which awarded each plaintiff a fifth of a million dollars *more* than the jury found him to be entitled.[1] The jury found in answer to Special Issue No. 3 that Dorman's damage amounted to $840,421.86 and that precise sum was set forth in the judgment he recovered against Columbia.[2] In answer to Special Issue No. 4, the jury found that Blackshear's damage totaled the sum of $715,507.25 which was set forth in his judgment against Columbia.

As stated in the *plaintiffs'* brief:

"Kirby, Gulf States, Casey, Minnis, and McBride made a *voluntary payment* to Dorman and Blackshear for two hundred thousand ($200,000.00) dollars each prior to trial and filed and reserved their cross-actions against Columbia for contribution and indemnity pursuant to Article 2212a, V.A.C.S." (emphasis supplied)[3]

Motions in limine sustained by the trial court prevented Columbia from making such fact known to the jury. The Court submitted to the jury only the question of negligence as applicable to the plaintiffs, Columbia, and Kirby. No submission was made as to the other named defendants. As noted by the Chief Justice in Part II of

his opinion, the jury fixed the percentage of negligence against Columbia as one hundred percent.

▮ Over Columbia's objections, the trial court entered judgment for the respective plaintiffs for the precise amounts found by the jury as compensation for their *total* damages and refused to allow any credit for the $400,000 which the plaintiffs had already received from the settling defendants. Thus, while each plaintiff recovered judgment for the total amount the jury fixed as his damages, each plaintiff has retained the $200,000 which he had received from the settling defendants. This chart reflects the true facts:

Dorman's Recovery:

| | |
|---|---|
| Jury verdict for total damages: | $ 840,421.86 |
| Cash paid by settling defendants: | 200,000.00 |
| Total recovery: | $1,040,421.86 |

Blackshear's Recovery:

| | |
|---|---|
| Jury verdict for total damages: | $ 715,507.25 |
| Cash paid by settling defendants: | 200,000.00 |
| Total recovery: | $ 915,507.25 |

Moreover, the trial court ordered Columbia, in the judgment, to pay to the several settling defendants the amount of their contributions to the two plaintiffs. The net effect of these two rulings was to permit each plaintiff to keep his windfall excess damages of $200,000 *and* required Columbia to make whole the settling defendants for their voluntary contributions to plaintiffs' settlements. Part III of the opinion of the Chief Justice, supra, has rectified the latter aberration and we do not further comment on the point.

We now quote from a few of the authoritative decisions of our courts upon which

1. The damage issues as to Dorman and Blackshear were submitted separately but the question propounded was the same in each instance: "What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate [Dorman or Blackshear] for his injuries, if any, which you find from a preponderance of the evidence resulted from the occurrence in question?" This was followed by a listing of seven elements of damage authorized for consideration and the jury, in each instance, placed a monetary figure opposite such element of damage.

2. In each instance, the subrogated compensation insurer was awarded its payments which were deducted from the sums awarded in the judgment to Dorman and Blackshear pursuant to the subrogation provisions of the Worker's Compensation Act.

3. The payment of $400,000, divided equally between the two plaintiffs, was made up by contributions as follows: Kirby—$200,000; Gulf States—$100,000; Casey—$45,000; Minnis—$30,000; and McBride—$25,000.

we rely in confining each plaintiff's recovery to the total damages fixed by the jury:

(1) Chief Justice Hickman in *Bradshaw v. Baylor University*, 126 Tex. 99, 84 S.W.2d 703, 705 (1935):

> "It is a rule of general acceptation that an injured party is entitled to but one satisfaction for the injuries sustained by him. . . . There being but one injury, there can, in justice, be but one satisfaction for that injury. . . ."

(2) Chief Justice Greenhill in *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 766 (Tex.1964):

> "Perkins relies on a number of Texas cases which state the rule that the non-settling tortfeasor is entitled to credit on the judgment for the amount already paid for the covenant not to sue. . . ."

(3) Mr. Justice Pope in *McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex.1971):

> "In holding as we do, we preserve the rule that a claimant in no event will be entitled to recover more than the amount required for full satisfaction of his damages. . . ."

(4) Mr. Justice Steakley in *T. L. James and Company, Inc. v. Statham*, 558 S.W.2d 865, 868 (Tex.1977):

> "We adhere to the rule stated in [Bradshaw, supra] and explicitly reaffirmed in [McMillin, supra], that a claimant in no event will be entitled to recover more than the amount required for full satisfaction of his damages."

Many other authorities could be cited but to do so would belabor a point well settled by our own Supreme Court.[4] Even *Deal v. Madison*, 576 S.W.2d 409, 419–420 (Tex.Civ. App.—Dallas 1978, writ ref'd n.r.e.), relied upon by the Chief Justice, is in accord with the views expressed in the *Bradshaw* and *Statham* cases cited above.

We do not consider *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246 (5th Cir. 1979),

either persuasive, pertinent, or apposite. It is a case from another jurisdiction whose holdings are not controlling. The case arose under the Jones Act "and general maritime law" which was decided in a federal court in Louisiana and the opinion did not touch, even tangentially, any Texas cases or statutes. If such a doctrine set out in *Leger* is to be imported into Texas law, it should be done by the legislature or by our Supreme Court.

### Conclusion

Consequently, the judgment of the trial court which awarded Dorman and Blackshear the precise sums found by the jury in answer to Special Issues 3 and 4, respectively, is now reduced as to each plaintiff by the sum of $200,000 which each plaintiff received from the settling defendants; and, as reformed, the judgment as to the said plaintiffs is now affirmed; the portion of the judgment which awarded the subrogated worker's compensation insurance carrier (and its attorneys) a portion of the sum awarded to each plaintiff is affirmed; the portion of the judgment which ordered Columbia to pay to the settling defendants the amount which said defendants had paid to plaintiffs is reversed and judgment rendered denying said settling defendants any recovery against Columbia.

Pursuant to the provisions of *Tex.R. Civ.P. 448*, for reasons apparent from this concurring opinion, one-third of the costs in all courts is assessed against the plaintiffs, jointly and severally; one-third of said costs is adjudged against the settling defendants (as set out in footnote 3, supra), jointly and severally; and, one-third of said costs is adjudged against Columbia.

Affirmed in part, modified and affirmed in part, and in part reversed and rendered. It is so ordered.

CLAYTON, Justice, concurs.

I join in this concurring opinion.

---

4. See, e. g., *McCrary v. Taylor*, 579 S.W.2d 347, 350 (Tex.Civ.App.—Eastland 1979, writ ref'd n. r. e.), quoting from the foregoing line of cases and, additionally, citing and quoting from *Restatement (Second), Torts 2d § 885(3) (1979)*, and *Schering Corp. v. Giesecke*, 589 S.W.2d 516, 519 (Tex.Civ.App.—Eastland 1979, writ pending), and authorities therein cited.