**ESTEVE COTTON COMPANY,**
**Appellant,**

v.

**Millard HANCOCK, Appellee.**

**No. 8648.**

Court of Civil Appeals of Texas,
Amarillo.

June 14, 1976.

Rehearing Denied July 12, 1976.

Grady, Johnson, Smith & Blakeley, Thomas A. Blakeley, Jr., Dallas, for appellant.

La Font, Tunnell, Formby, La Font & Hamilton, Bill La Font, Plainview, for appellee.

REYNOLDS, Justice.

The assignee of a cotton contract sought to recover from a cotton grower the extra cost of cotton purchased on the open market to cover cotton allegedly contracted to be sold, but not delivered, by the grower. A take-nothing judgment was rendered upon the jury's failure to find that the contracting parties mutually intended that the contract price specified for the highest specified micronaire quality cotton should apply to the higher micronaire quality cotton actually produced by the grower. Recovery was not established as a matter of law, and the jury's response to the vital factual inquiry is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Affirmed.

Millard Hancock has been a grower of upland cotton for approximately twenty-five years and active in management of the City Gin for some fifteen years in the Abernathy, Hale County, Texas, area. Clarence Young, a resident of nearby Lubbock, has engaged in the cotton business for about thirty-six years. Hancock and Young have

known each other since 1951 and for ten or fifteen years prior to 1973, Young had bought most of the cotton produced by Hancock. For a few days in 1973, Young worked as a commission agent for Gant Cooley Cotton Co., Inc., buying cotton to be produced by four growers. One of the growers was Hancock. On 10 April 1973, Young, as buyer, and Hancock, as seller, signed a typed contract furnished to and completed in handwriting by Young. Except for the inked-in "73–74" and the entries to be noted, the contract has this typed language:

> Seller hereby agrees to sell and deliver, and does hereby sell, assign, and convey to Buyer the entire production of lint cotton for the 1973–74 cotton harvesting season from the following listed acreage in ____ County, Texas, excluding any cotton that has been harvested and ricked as of the date of execution of this contract:

| Farm No. | Acreage | Estimate of No. of Bales To Be Delivered Under this Contract |
|---|---|---|
| K 8 | 120 | 110 |
| D 104 | 40 | 40 |
| D 31 | 36 | 35 |

The farm identifications, the acreage and the estimated production were entered by Young from information Hancock furnished. Reproduced verbatim, paragraph (4) of the contract, which Young completed in his handwriting from a contract in Gant Cooley's office to provide for the computation of the price of the cotton is:

> (4) The price shall be related to the official USDA government loan value as determined by the original USDA official government class as follows:

```
 mike - points prm. All spots (66-61)/70-71, mike pts over- Tinges - Stains mike pts over
 35 1/100 35 700 35 400
Grades 2-1 +5.1-21/32 | no 33 1/050 33 700 33 400
 30/32 950 30-32 600 30-32 400
 27/29 800 27-29 500 27-29 400
 24/26 400 24-26 400 24-26 400
 -24 200 -24 200 -24 200
```

The typed form contains two paragraphs (5), reading:

> (5) Buyer shall be under no obligation to accept and pay for cotton classed B.G. (below grade) as determined by the original USDA official government class.
>
> or
>
> (5) The price for B.G.'s shall be _____
>
> (Strike out inapplicable paragraph)

Neither paragraph was stricken and the second of the two was not completed. In the sixth paragraph, it was provided that:

> (6) . . . Seller also warrants and represents that he is either the owner of the land on which the cotton is produced, or that he has authority from the owner of the land to enter into this contract for the sale of each and every bale of cotton to be produced on the above described acreage . . . . .

The final paragraph of the contract reads, in part:

> (7) Seller and Buyer, with Gant Cooley Cotton Co., Inc. acting as agent for Buyer, have carefully read and fully understand the terms and provisions of the foregoing contract, which represents the entire agreement between the parties.
>
> . . . .

Used as a column heading in paragraph (4), "mike" is an abbreviation for micronaire which refers to the coarseness of the cotton fiber. The coarseness of the fiber is said to depend on the weather which varies from year to year in West Texas and, as a result, it is not possible to know at planting time what the micronaire quality of the future cotton production will be. Every

bale of cotton is tested for coarseness at a government classing office. The most desirable upland cotton, called "premium mike cotton," is that within the 3.5 to 4.9 micronaire range; cotton below 3.5 and above 4.9 does not command as good a price as does premium mike cotton. In six of the seven years prior to 1973, a low of 19% and a high of 68% of all cotton processed in the Lubbock classing office, which processes the Abernathy area cotton, tested 3.5 or higher; however, during the ten years prior to 1973, Hancock had never raised any cotton testing higher than 2.8 micronaire. Of the 1973 cotton crop tested by the Lubbock Office, 81% had a micronaire reading of 3.5 or higher and 8% was above the 4.9 reading. Nearly all of Hancock's 1973 production was in the 3.5 to 4.9 range.

The paragraph (4) "Points over" and "Pts. over" columns refer to the amount, calculated at one cent per pound for each 100 points entered for the class of cotton, in excess of the government loan rate, a form of price support, which is computed and published each year by the Commodity Credit Corporation of the United States Department of Agriculture. Each annual publication lists the loan price in cents per pound according to grade and staple length and the premium or discount, if any, for micronaire differentials. Publication dates have varied from as early as May 17 in 1967 to as late as October 19 in 1965.

Micronaire readings were introduced in 1965 to more accurately reflect the values of cotton having various micronaire readings. For that year's upland cotton, the publication listed the most desirable micronaire range as 3.6 through 4.8 for which a premium of 14 points was awarded. Neither a premium nor a discount was provided for micronaire readings of 3.3 through 3.5 and 4.9 through 5.1. Discounts were shown for the micronaire ranges of 2.6 or less, 2.7 through 2.9, 3.0 through 3.2, 5.2 through 5.4, and 5.5 and above.

Beginning with the crop year of 1966 and continuing through the crop year of 1973 to which the contract in dispute is referenced, the published regulations established the most desirable micronaire range as 3.5 through 4.9, for which a premium above the loan rate was set in the years 1966 through 1970, but not thereafter. Discounts of varying amounts were shown for the micronaire ranges of 2.6 and less, 2.7 through 2.9, 3.0 through 3.2, 3.3 through 3.4, 5.0 through 5.2, and 5.3 and above.

The 1973 publication was on July 20. It scheduled the micronaire differentials for the 1973-crop upland cotton as follows:

| Micronaire Reading | Points Per Pound |
|---|---|
| 5.3 and above | Discount of 150 |
| 5.0 through 5.2 | Discount of 65 |
| 3.5 through 4.9 | 0 |
| 3.3 through 3.4 | Discount of 70 |
| 3.0 through 3.2 | Discount of 180 |
| 2.7 through 2.9 | Discount of 300 |
| 2.6 and less | Discount of 450 |

Other than the data contained in the 20 July 1973 publication, all of the foregoing facts and circumstances were either known to or easily ascertainable by the contracting parties on the date of their contract. Hancock had not planted his cotton. Each identified farm contained, and was later planted to, more cotton acreage than was shown for the farm in the contract. Hancock determined and measured the contracted acreage on each farm.

Hancock placed his copy of the contract in his pick-up truck. The original contract was assigned by Gant Cooley to Esteve Cotton Company, a Dallas based corporation engaged in the cotton merchandising business, which sold to cotton mills throughout the world cotton to be delivered in the future.

There was an unprecedented and significant rise of the market price of cotton during the summer and fall of 1973. By the November-December, 1973 harvest time, the market price was more than double the price fixed in the contract Hancock had signed.

From the measured 36 acres on farm D 31, Hancock produced the total of 32 bales of cotton, each of which tested in excess of 3.5 micronaire. Without referring to the contract, Hancock delivered the 32 bales

and received from Young the price shown in the contract for 3.5 micronaire cotton.

Thereafter and upon hearing talk that his contract did not "cover cotton that miked over 3.5," Hancock reread the contract and then sought legal advice. Subsequently, Hancock's attorney gave notice to both Esteve and Gant Cooley that Hancock did not intend to deliver any cotton testing above 3.5 micronaire at the contract price for 3.5 micronaire cotton, but a tender of the cotton at the current market price was made.

Hancock produced 94 bales of cotton from the 120 measured acres on farm K 8. One of the bales tested 3.5 micronaire and it was delivered pursuant to the contract; the remaining bales tested in excess of 3.5 and they were sold on the open market. The measured 40 acres on farm D 104 produced 40 bales of cotton, all of which tested in excess of 3.5 micronaire and were sold on the open market. The open market sales were made to Dan Fry as buyer for H. C. Littlefield Cotton Company after Fry had read Hancock's contract to Littlefield for approval of the purchases.

To fulfill its contracts, Esteve bought cotton on the open market at a price in excess of the price fixed for 3.5 micronaire cotton in the Young-Hancock contract. Esteve then brought this suit to recover from Hancock the difference between the contract price and the price it had paid for replacement cotton. Esteve grounded its suit on the theory that Hancock had contracted to sell and deliver all of the cotton he produced from the listed acreage because the "mike 3.5" provision in the contract referred to all cotton with a micronaire reading of 3.5 and higher at the price of 1100 points above the loan rate.[1]

A jury heard the testimony of twenty-three witnesses and examined thirty-three exhibits. The foregoing and the following summaries are extracted from the record.

Young's understanding of the contract was that the highest price was for cotton with a 3.5 and better micronaire reading; he had never seen a contract where a farmer sold only his cotton with a low micronaire reading and excluded his cotton with a micronaire reading of 3.5 and higher. In Young's opinion, when a farmer speaks the designation 3.5, he is talking about 3.5 and better. Young did not "remember for sure" whether he and Hancock discussed "what was being contracted and what prices," but he testified, "I think he asked me what the 3.5 was. And I'm sure, if he did, I told him, '3.5 and better.'" Young further said that there was no conversation about leaving the price open on any cotton; yet, upon specific inquiry, Young said the contract does not attempt to cover below grade cotton, explaining, "Well, left it up to the farmer on that." Young conceded that when he bought cotton for himself and another cotton company, he always put in the micronaire range and the price because he did not want any misunderstanding.

It was Hancock's testimony that he signed the contract to lock in a profit at the price set, that both he and Young were in a hurry, and that he relied on Young's skill and judgment when he signed the contract. When Hancock asked Young to explain the contract, Young showed him paragraph (4). Hancock said that they only discussed the price shown in the contract for 3.5 and down micronaire cotton. The question of any discussion whether the contract covered cotton with a micronaire in excess of 3.5 and the matter of Hancock's assumption were developed in his pre-trial deposition as follows:

Q Did Mr. Young tell you that this contract did not cover cotton that miked over 3.5?

A The question was never brought up.

\* \* \* \* \* \*

1. Throughout the trial proceedings, Hancock took procedural steps to present his objections that Esteve's petition is insufficient, as a matter of law, to form the basis of any judgment against Hancock, and that there is a defect of parties. These matters are mentioned by Hancock on appeal, but, because they are not the subject of any cross-point, they will not be further noticed.

Q All right. He didn't say it did; he didn't say it did not?

A That's right.

Q It just wasn't discussed. All right. Was it your assumption that it did?

A No, sir.

Q Well, you did deliver some cotton at first on this contract that was above 3.5?

A I sure did.

Q All right, then. So, at the time you made the delivery, you were assuming that it was covered, is that right?

A Yes, but I didn't—I hadn't—I lost my cotton contract, and I didn't find it.

* * * * * *

Q So you assumed that the cotton covered all—that the contract covered all the cotton?

A I did until I read that contract.

Again referenced to his trial testimony, Hancock, called as an adverse witness by Esteve, was questioned and he answered as follows:

Q And what did you do with your contract after it was signed, Mr. Hancock?

A Put it in my pickup.

Q And actually didn't think anything else about it until cotton went up to such a fantastic price and you began to gather your cotton and get it classed and graded, isn't that right?

A I didn't think anything about it until somebody told me I might better get that contract out and read it.

Q In other words, you were under the impression, apparently, that the contract covered—since the loan price was the same and the market price was the same, 3.5, didn't make any difference whether it was 3.5, 3.6 or whatever it was, if it was 3.5 or over, that it would be 1100 points?

A I did until I reread that contract.

Q That was your understanding of it until you reread the contract?

A Yes, sir.

Shortly thereafter, Hancock was asked and he replied that:

Q Did you consider when you signed the contract that you were leaving the price open for part of the cotton?

A Yes, sir.

Q You thought that when you signed the contract?

A Yes, sir.

Q And, yet, you delivered thirty-two bales that had a micronaire of more than 3.5 and now say that, when you read the contract, you decided it didn't cover cotton miking above 3.5?

A Yes, sir.

James Walker, a farmer in Lynn County some eighty miles distant, testified that he did not know what the custom was in Hale County, but in Lynn County 3.5 mike refers to a micronaire range of 3.5–4.9 in the government loan, and in his opinion the contract did not cover either 3.4 or 5.1 micronaire cotton. It was the experience of Sammy Means in farming for six years twenty-two miles southwest from Lubbock that when farmers and cotton buyers are talking about cotton that might be 3.5 or 4.0, they refer to it as 3.5 mike "lot of times," and as long as the cotton is in the approved range of 3.5 through 4.9, they refer to it as 3.5 "sometimes." Although he had not talked with any Hale County farmers about the specific matter, Means was sure that all South Plains farmers use the same language. When shown the Young-Hancock contract, Means remarked, "Looks like the same contract that I have," and stated that, in his judgment, the Young-Hancock contract covers 3.4 cotton at the 3.3 price and 5.1 and 5.2 cotton at the 3.5 price.

Roy Davis, a Plainview cotton merchant for twenty-nine years, reported that his interpretation of a farmer's statement that he has so many bales of 3.5 cotton would be "3.5 to 4.9." When asked, Davis replied that under the contract in issue, the buyer would be obligated to take all cotton with a micronaire reading of 3.5 or above, but he said there was no custom and usage in the trade that 3.5 means 5.1. John K. Yorston, vice-president of Esteve, testified that the

common usage of the term 3.5 in the cotton business means 3.5 micronaire and better.

L. G. Montgomery, a nineteen year farmer in the Abernathy area, expressed the opinion that there was not, and Raymond Akin, a forty-five year Plainview cotton grower, said he doubted that there was, a custom whereby a farmer would understand that a reference to 3.5 in a cotton contract includes 3.5 and higher micronaire. From his knowledge of the business in which he was engaged, Montgomery said, and Akin agreed, that the contract in dispute does not cover any cotton above 3.5 micronaire quality. J. F. Buskey's testimony was that he was familiar generally with the custom of selling cotton in the Abernathy area where he has been raising cotton since 1950, and that, based upon his experience and an examination of the Young-Hancock contract, it "would cover anything from 3.5 on down" but not above.

Harvey Lutrick, who was generally familiar with the customs of the sale of cotton in the Abernathy area where he has farmed cotton since 1948, said the contract in dispute only covers the micronaires that are set forth in it. Horace Wardlow, a thirty year cotton farmer in the Plainview area, gave similar testimony. Martin Schur, a Plainview cotton farmer for twenty-seven years, expressed the opinion that the Young-Hancock contract did not cover cotton with a micronaire reading of 3.4 or above 3.5.

Acknowledging a general familiarity with the customs of the sale of cotton, James Davis, an Abernathy farmer for thirty-nine years, W. T. Settle, an Abernathy farmer for thirty-one years, Elbert Harp, an Abernathy farmer raising cotton since 1951 and Mrs. Kathryn Raymond, who has farmed for herself near Hale Center for four years, all stated that the cotton with a micronaire reading above 3.5 was not covered by the Young-Hancock contract; however, each admitted having pending a suit involving the question whether cotton above 3.5 micronaire was covered under a similar contract. Davis further said that there was no custom or usage of the trade

by which the contract would cover above a 3.5 micronaire reading and that the disputed contract did not cover 3.4 micronaire cotton, although he agreed that 3.3 and 3.4 micronaire cotton carries the same discount and that the premium base is 3.5 through 4.9.

T. E. Chapman, a Plainview cotton buyer since 1946, has been in the cotton merchandising business for sixty-one years. He also buys for Gant Cooley. He testified that he never had read a contract like the one in dispute and, in his opinion, it did not cover cotton with a micronaire of 3.4 or of 3.6 and above. He conceded, however, that he had never seen a provision in a contract that specified cotton with micronaire higher than 3.5 was not covered. Acknowledging the government loan micronaire ranges, Chapman declared that he and most shippers pay more for cotton with a 4.2 and better micronaire reading than they will pay for 3.5 micronaire cotton. The cotton house for which he buys will pay more for a group of bales of 4.0 micronaire or better than for a group with 3.5 to 3.9 micronaire readings because it is better cotton.

L. L. Duckett, the manager of the City Gin owned in part by Hancock, testified that during the latter part of November of 1973, Young "asked me if any farmers, any farmers, had any cotton contracted that only showed up to 3.5 that he would like the chance at buying the cotton all above 3.5, 3.5 and up." According to Duckett, Young did not actually buy any of the cotton and, apparently, the conversation occurred after Young heard that some of the Abernathy farmers had decided their cotton contracts were incomplete.

Charles Lambert, an Abernathy farmer and part owner of the City Gin, had signed, and has pending a suit on, a contract similar to the Young-Hancock contract. He recalled his fall of 1973 conversation with Young in which Young, who had seen Lambert's contract, asked Lambert what he was going to do with his cotton "that miked over 3.5" and said that he, Young, would be willing to buy it. Lambert did not know any custom in Hale County by which "3.5

mike . . . means 3.5 to 4.9 mike cotton."

Vic Struve is an Abernathy farmer since 1939 and part owner of the City Gin. He and another cotton buyer had entered into, and Struve has pending a lawsuit over, a contract similar to the Young-Hancock agreement. About the first of November, 1973, Struve showed his contract to Young and asked about it. Young said, as reported by Struve, that, "The contract means just exactly what it says, says 3.5 and below." Thereupon, Struve testified, Young offered to buy all of Struve's cotton "over 3.5." Shown the Young-Hancock contract, Struve said he knew of no custom or usage in the trade whereby the contract and the prices "would cover 3.6 cotton and above."

Duckett's version of the Struve-Young conversation was that Young told Struve the contracts "were absolutely incomplete," and that Young said "he would like to buy all the cotton above 3.5 mike." Mrs. Ruth Cox, a City Gin employee, testified that she overheard Young tell Struve "that the contract was not complete," but that she did not hear the rest of the conversation.

Young denied that he made the statements attributed to him by the latter four witresses.

The first special issue submitted to the jury inquired whether

. . . at the time the contract in question was signed, the parties mutually intended that the contract prices specified for 3.5 mike cotton should apply to any cotton produced by the defendant Hancock on the land described in the contract that would mike 3.5 (sic) or higher?

Ten members of the jury answered, "They did not intend," and then, in response to the other special issues, found that: (2) the applicable market price of Hancock's undelivered cotton was 54 cents per pound; (3) the contract price of the undelivered cotton was 27.35 cents per pound; and (4) the expenses saved by Esteve in consequence of Hancock's failure, if any, to deliver the cotton was $5.00 per bale.

The trial court accepted the verdict. Overruling Esteve's motions for judgment non obstante veredicto and to disregard the jury's answer to the first special issue, the court rendered judgment that Esteve recover nothing.

Utilizing seventeen points of error, Esteve complains of the judgment in three major respects. Points one, two, three and five are directed to the proposition that Esteve is entitled to judgment on the contract and under the evidence as a matter of law. The jury's answer to special issue no. 1 is challenged by legal insufficiency and against the great weight and preponderance points four and six. Points seven through seventeen are complaints of the admission and exclusion of evidence.

Esteve's claim to judgment begins with its theory that the contract is unambiguous and covers all of Hancock's 1973 cotton production from the identified acreage with the price shown for "3.5" applying to all cotton of 3.5 and higher micronaire readings. Therefore, Esteve continues, the first special issue was immaterial and should be disregarded with the result that under the stipulations of 133 undelivered bales at an average weight of 500 pounds and the jury's answers to the remaining special issues, Esteve is entitled to judgment of $18,-592.40, including prejudgment interest.

To illustrate its theory that the contract is unambiguous, Esteve cites *H. Molsen & Co., Inc. v. Harp and Lovelace,* 516 S.W.2d 433 (Tex.Civ.App.—Amarillo 1974, no writ), a venue case involving the identical contract defect, and declares, "This Court held that the buyer was entitled to judgment as a matter of law, holding that the farmer-plaintiffs had no cause of action." Esteve has misconstrued our holding on the issue before us.

Harp and Lovelace filed in Hale County a suit seeking a declaratory judgment that their contract with Molsen did not embrace cotton with a micronaire test above 3.5. Molsen interposed a plea of privilege, claiming the right to defend in Dallas County, its domiciliary county. In the course of the opinion we did say at p. 436:

If in fact the trial court impliedly found, consistent with plaintiffs' pleaded dominant purpose to secure the declaration, that there is *no* contract requiring plaintiffs to deliver the cotton Molsen demanded, then plaintiffs failed in their burden to prove the existence of a contract which could be breached by Molsen. In that event, there would be an absence of proof that a cause of action or part thereof arose in Hale County so as to support venue under subdivision 23.

But those statements are nothing more than the rationale why venue is not maintainable in Hale County under one of the subdivisions of the general venue statute relied on by Harp and Lovelace. We did not hold that Harp and Lovelace had no cause of action; we merely held that they failed to specifically plead and prove that their declaratory judgment action came within any exception to the general venue statute so as to deprive Molsen of the right to defend in Dallas County.

By supplemental briefs, Esteve contends, and Hancock disagrees, that the recent Supreme Court decision in *Hohenberg Brothers Company v. George E. Gibbons and Company*, 537 S.W.2d 1, 19 Tex.Sup.Ct.J. 310 (1976), necessarily means that Hancock's entire crop was sold and that the price listed next to "35" in the contract applies to 3.5 and all above micronaire cotton. In Esteve's view, the Gibbons-Hohenberg contract "describes the highest micronaire category simply as '3.3' without spelling out '3.3 and up,'" and "the Supreme Court was satisfied that the contract unambiguously covered all of the production." Here, again, Esteve has misconstrued the issue before the Court and the holding.

In *Hohenberg*, the brokerage firm of George E. Gibbons and Company, which had reached an oral but not a written agreement with farmer Setliffe for the purchase of the future cotton production from 295 acres, contracted in writing to sell "the entire production on 295 acres of lint cotton" to be produced by Setliffe to cotton merchants Hohenberg Brothers Company. The price was 1650 points over the 1973

government loan price subject to the quality clause provisions that "micronaire 3.3 and bales with micronaire below 3.3" and bales "showing bark or grass" are "to be discounted according to the 1973 government discounts" therefor. A clause in the contract provided for shipment as soon as the cotton warehouse receipts, samples and classification cards were delivered to Gibbons. Setliffe refused to give a written confirmation or to deliver his cotton production; Gibbons did not deliver Setliffe's cotton and Hohenberg sued Gibbons for failure to deliver pursuant to their written contract. Setliffe was not made a party to the suit. Gibbons sought to escape liability for non-delivery on the ground that its receipt of the instruments enumerated in the shipment clause was a condition precedent to its performance. The ultimate issue before the Court was whether the contracting parties intended for the delivery of the instruments to Gibbons to be a condition precedent to its liability. After setting out and reviewing the entire contract and the controlling principles of law, the Supreme Court held that the parties did not so intend. In amplification, the Court said that Gibbons' receipt of the instruments did not condition its duty to deliver the cotton and that its failure to receive them cannot be a defense to the contract.

In the course of its opinion, the Supreme Court did state that "it is clear that a contract was made whereby Gibbons agreed to furnish Hohenberg with the 295 acres of Setliffe cotton"; but, unlike our controversy, no one in *Hohenberg* questioned that Gibbons had agreed to deliver Setliffe's entire production of cotton from 295 acres at the price stated less discounts applicable under the quality clause. The Supreme Court did not speak to the matter of micronaire quality and, in our view, the quality clause, rather than being descriptive of the micronaire readings covered by the contract, only provides for the discount for bales with a micronaire reading of 3.3 and below and those showing bark or grass. Moreover, as Hancock replies, if "3.3" means "3.3 and up," as Esteve interprets the contract, then every bale of cotton, re-

gardless of its micronaire quality, would be discounted and, consequently, the price clause would be a nullity. For these reasons, *Hohenberg* is not dispositive of the meaning of the contract before us.

■ We, then, must look to the contract to ascertain if the intention of the contracting parties is expressed in or apparent from the language used. This entails an examination and consideration of the entire writing with the view toward harmonizing and giving effect to all the provisions. *Universal C. I. T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 158 (1951). Absent any ambiguity in the contract, its construction is a question of law for the court, *Myers v. Gulf Coast Minerals Management Corporation*, 361 S.W.2d 193, 196 (Tex. 1962); but, if the contract is reasonably capable of conflicting constructions as to its true meaning, parol evidence is admissible and, if it is also conflicting, the intent of the contracting parties is a question of fact for the trier of the facts. *Neece v. A.A.A. Realty Co., Inc.*, 159 Tex. 403, 322 S.W.2d 597, 602–603 (1959).

The contractual paragraph first quoted is clear and, therefore, unambiguous. The unequivocal agreement there is for the sale and delivery of the entire future production of the 1973–74 crop of lint cotton from the listed acreage, the exclusion of cotton already harvested being patently inapplicable because the crop had not then been planted. This expression is harmonious with the paragraph (6) provision that Hancock is authorized to contract for the sale of each and every bale of cotton produced on the described acreage. An inconsistency creeps in, however, when the two paragraphs (5) are considered, for then it becomes unclear whether below grade cotton is included in or excluded from production. Although the discrepancy exists, it is neither of sufficient import to render ambiguous the otherwise plainly expressed intention of the parties to contract for the sale and delivery of the entire production, *cf. Lone Star Gas Co. v. X–Ray Gas Co.*, 139 Tex. 546, 164 S.W.2d 504, 508 (1942), nor necessarily inharmonious with a reasonable construction of the contract as hereinafter demonstrated.

Given the agreement of the parties for the sale and delivery of the entire production from the identified acreage, the crucial inquiry is whether the language used in paragraph (4) expresses as a matter of law, or is so unclear as to require parol evidence to ascertain, the parties' intent of the price to be paid and received for the complete range of the quality of cotton that may be produced. Esteve says that "3.3" means "3.3 through 3.4" and that "3.5" means "3.5 and higher" micronaire quality. Hancock says that "3.3" and "3.5" mean only "3.3" and "3.5" respectively.

■ A consideration of the language shows that the price is structured according to grades and micronaire quality. The price computation for the micronaire readings from minus 2.4 through 3.3, inclusive, is precisely scheduled, but omitted from the schedule is any definite mention of cotton with a micronaire reading of 3.4 or 3.6 and above. Although the price of the cotton is related to the government loan value not then published, the contract schedule of micronaire ranges is not, except for the two ranges of 2.7 through 2.9 and 3.0 through 3.2, compatible with any schedule of range of micronaire differentials theretofore published by the government. In the government publications establishing micronaire differentials for loan rate purposes, with which the contracting parties were familiar, there is no expression indicating that "3.3" or "3.5" has any meaning different from the single micronaire quality one would normally expect each term to represent. From these considerations, it is neither so evident nor so notoriously well known that "3.3" means "3.3 through 3.4," or that "3.5" means "3.5 and higher," micronaire quality that we can say so as a matter of law. Further considering that Young had entered the micronaire ranges in a precise manner from minus 2.4 through 3.3, but then skipped 3.4 and entered 3.5 before Hancock saw and signed the contract, we cannot hold as a matter of law that they

intended the terms to have the meaning for which Esteve contends.

Still, Esteve argues that the only reasonable construction is that "3.5" means "3.5 and higher" because, otherwise, the contract would mean that Esteve is not entitled to delivery of most of the cotton Hancock did produce. The immediate difficulty with the argument is that it is premised on hindsight and not on the circumstances surrounding the execution of the contract. It overlooks the facts that when the contract was signed, Young had been buying most of Hancock's cotton production for ten to fifteen years, Hancock had not theretofore produced any cotton with a micronaire reading above 2.8, and there is no evidence that Hancock's 1973 crop was expected to be of any higher quality than his prior crops.

Conversely, Esteve insists that the contract cannot be construed as covering only the cotton with the micronaire readings listed because that construction would ignore the emphatic references in the first paragraph to the "entire production of lint cotton" and in paragraph (6) to Hancock's warranty "that he has authority . . . for the sale of each and every bale of cotton to be produced on the above described acreage." Reference is made to V.T.C.A. Bus. & C. § 2.201(a) which, insofar as it is consistent with Esteve's position, declares that "(a) writing is not insufficient because it omits or incorrectly states a term agreed upon . . . ." Hancock is just as insistent that the contract is unambiguous and must be construed to cover only the micronaire quality actually listed because paragraph (7) of the contract provides that it is the "entire agreement between the parties," and to enlarge upon the plain language used in paragraph (4) would violate the V.T.C.A. Bus. & C. § 2.201(a) provision that a writing which omits or incorrectly states a term agreed upon "is not enforceable under this paragraph beyond the quantity of goods shown in such writing."

In connection with Hancock's position, it is appropriate to observe that the contract's micronaire terms are qualitative and not quantitative; but, whatever the ultimate construction of the contract, no violence is done to V.T.C.A. Bus. & C. § 2.201(a). The crux of the code provision is the phrase "a term agreed upon." If paragraph (4) of the contract has omitted or incorrectly stated the micronaire quality ranges agreed upon, the contract is enforceable for the quantity —i. e., the entire production of lint cotton— shown in the contract; if paragraph (4) correctly states the micronaire ranges agreed upon, then V.T.C.A. Bus. & C. § 2.201(a) is not applicable. More important, however, is that the conflicting contentions overlook the equal alternative construction that the contracting parties may have intended, as was their right, to conclude the contract without settling the price for cotton with micronaire quality other than that explicitly listed, V.T.C.A. Bus. & C. § 2.305(a); *H. Molsen & Co., Inc. v. Harp and Lovelace, supra,* at 437, resulting in a price therefor, absent any other agreement, as the reasonable price at the time for delivery. V.T.C.A. Bus. & C. § 2.305(a)(1). If that was the real intent of the contracting parties, the conflicts posed by the litigants would disappear and all provisions of the contract, including the two paragraphs (5) which would then be understood to include any below grade cotton at the market price, would be in harmony and would be given effect.

Yet, we cannot conclude as a matter of law that the contracting parties intended to make a contract for the entire production and to leave the price open for any 3.4 and any above 3.5 micronaire cotton that may be, but had not theretofore been, produced by Hancock. In such an event, it is reasonable to expect that, in the light of the explicit micronaire ranges entered in paragraph (4), some mention of the exclusion of any open price cotton would have been, but it was not, made in the contract, particularly when the first paragraph excluded previously harvested cotton, which could not exist on the date the contract was signed. The reasonableness is strengthened by the recollection that both parties are chargeable with the knowledge that, on the date of the

contract, the micronaire quality of the future production could not be determined with any degree of certainty and that cotton with micronaire quality above 3.5 was produced each year in the area.

Obviously, the examination and consideration of the entire contract leaves unresolved the true intent of the contracting parties. While the various contentions of the litigants have predicated merit, they more aptly illustrate that the contract is reasonably capable of conflicting constructions. Thus, the trial court correctly determined that the contract is ambiguous and properly admitted parol evidence bearing on the intent of the contracting parties.

Esteve next asserts that the extrinsic evidence of Hancock's judicial admissions and of his own interpretation of the contract is conclusive that Hancock intended to contract his above 3.5 micronaire cotton at the contract price for 3.5 cotton. The evidence selected is Hancock's testimony previously quoted by which Esteve says Hancock admitted, without later modification or explanation, that at the time he signed the contract he was under the impression that if he produced cotton above 3.5 micronaire, it would be 1100 points. The evidence of Hancock's own interpretation of the contract is Hancock's delivery of the 32 bales, without protest and knowing that each bale was over 3.5 micronaire, at the contract price for 3.5 micronaire cotton, under the assumption that the contract covered all cotton until he reread the contract.

■■■ The term "judicial admission" is used in Texas law to connote a deliberate, clear and unequivocal formal act [2] done in the course of a judicial proceeding which amounts to a waiver of proof in favor of the opposing party and binds the declarant contrary to an essential fact embraced in his theory of recovery or defense. Within the meaning of judicial admission is a litigant's testimony of positive and definite facts which, if true and not modified or explained by him, would defeat his right of

recovery or defense. *Griffin v. Superior Insurance Company*, 161 Tex. 195, 338 S.W.2d 415, 418–19 (1960). Because the effect is that the declarant swears himself out of court, the principle is, as it should be, applied with caution. *United States Fidelity & Guaranty Co. v. Carr*, 242 S.W.2d 224, 229 (Tex.Civ.App.—San Antonio 1951, writ ref'd).

■■■ Akin to the question of Hancock's judicial admissions is the issue of the construction he placed on the contract. Where there is a doubt as to the meaning of a contract, the courts may consider the interpretation placed upon it by the parties themselves. *Lone Star Gas Co. v. X–Ray Gas Co., supra*, 164 S.W.2d at 508. It has been said that great, if not controlling, weight should be given to the interpretation the parties place upon an uncertain contract. *James Stewart & Co. v. Law*, 149 Tex. 392, 233 S.W.2d 558, 561 (1950).

■■■ But on the other hand, informal statements made incidentally in the course of judicial proceedings which are inconsistent with the declarant's present position, and acts from which it may be inferred that the facts in issue are not as the actor now claims, are extra-judicial admissions or quasi-admissions. They are admissible against, but they are not conclusive on, the admitter or actor; the statements and acts merely form a part of the evidence and their weight and probative force are matters for the trier of the facts. 2 C. McCormick and R. Ray, Texas Law of Evidence §§ 1127–29; §§ 1147–48 (2d ed. 1956).

■■■ In our appraisal, the testimony given by Hancock in response to the questions of his impression, understanding and assumption, and his act of delivering the 32 bales of cotton under the contract, amount to no more than extra-judicial admissions which are not conclusive against him. Careful perusal of the record reveals that nowhere in his testimony did Hancock unequivocally admit that at the time he signed

---

2. The formal acts, according to 2 C. McCormick and R. Ray, Texas Law of Evidence § 1127 (2d ed. 1956), include facts admitted by the pleadings, by agreed statement of facts or other stipulations and by formal declarations in open court by a party or his attorney.

the contract he was under the impression or understood or assumed that it covered all of his cotton with that in excess of 3.5 micronaire selling at the contract price for 3.5 cotton. The questions eliciting the answers that Hancock's impression and understanding was that the contract covered all of his cotton did not include a definite reference to the time Hancock signed the contract. In context, the questions and answers are as easily referable to sometime after the contract was executed. In fact, shortly after this examination when the questioner pinpointed the time of the signing of the contract, Hancock said he considered and thought that he was leaving the price open for part of the cotton. The inquiries developing Hancock's assumption that the contract covered all his cotton was clearly referenced to the time Hancock delivered the 32 bales, and these inquiries came immediately after Hancock had testified that he and Young had not discussed whether the contract covered above 3.5 micronaire cotton and that it was not his assumption that the contract did cover it. Hancock's delivery of 32 bales of above 3.5 micronaire cotton for the contract price of 3.5 micronaire cotton is evidence of his intent at the time he signed the contract; and, in a like manner, his refusal to deliver any more cotton of like quality for the same contract price, together with his testimony that at the time he signed the contract he did not assume it covered cotton above 3.5 micronaire and he considered and thought he was leaving the price open for part of the cotton, is also evidence of his intent at the time he signed the contract. The evidence, therefore, is not conclusive of Hancock's intent at the time he signed the contract, but it only forms a part of the submissible evidence for whatever weight and probative force the jury should accord it.

Because the contract is ambiguous and the parol evidence is conflicting, the matter of the intent of the contracting parties became a fact issue for the jury. It follows that special issue no. 1 and the jury's answer thereto are not immaterial.

With this status, Esteve next urges that the jury's answer to special issue no. 1 is contrary to the great weight and preponderance of the evidence and requires a reversal of the judgment and a remand of the cause. The evidence has been summarized in some detail and it will not be repeated or enlarged upon. Suffice it to state that among the conflicting evidence properly before the jury there is evidence which, if believed by the jury, would support an answer that the contracting parties either did or did not mutually intend that the contract price for 3.5 micronaire cotton should apply to Hancock's cotton of higher micronaire quality. It was the province of the jury to judge the credibility of the witnesses and the weight to be given their testimony, and to resolve the conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses. *Ford v. Panhandle & Santa Fe Ry. Co.*, 151 Tex. 538, 252 S.W.2d 561, 563 (1952). Accordingly, the jury was privileged to believe all or none of the testimony of any one witness or accept it in part while rejecting it in another part. *Creech v. Thompson*, 156 Tex. 561, 297 S.W.2d 817, 820 (1957). After reviewing all of the evidence with due regard for the jury's prerogative, we cannot say that the jury's answer to the special issue is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

The final segment of Esteve's attack on the judgment contains its complaints of the admission and exclusion of certain evidence. By this attack, Esteve seeks a reversal of the judgment and a remand of the cause to the trial court.

The attack begins with the contention that the trial court erred in allowing the witnesses Montgomery, Buskey, Harp, Lutrick and Raymond to testify, over Esteve's objection, that each had examined the Young-Hancock contract and in the opinion of each the contract did not cover cotton above 3.5 micronaire quality. It must be noted that prior to this testimony, the witnesses Walker, Means and Roy Davis were presented by Esteve and testified on cross-

examination without objection to their individual opinions of the contract coverage. Furthermore, Esteve does not complain on appeal of similar testimony, some of which appears to have escaped the running objection permitted Esteve, which was given by the witnesses Akin, Wardlow, Schur, James Davis, Settle, Chapman and Struve.

 Ordinarily, a witness will not be permitted to state what in his opinion an instrument covers. 2 C. McCormick and R. Ray, Texas Law of Evidence § 1425 (2d ed. 1956).[3] However, while the failure to object to certain testimony furnishes no basis for the trial court's admission of improper testimony of like import upon proper objection, the appellate court will not order a reversal because of the admission of improper testimony objected to when testimony to the same effect is permitted without objection. *Slayden v. Palmo*, 108 Tex. 413, 194 S.W. 1103, 1104 (1917).

 Continuing, Esteve asserts that the testimony of the witnesses Duckett, Lambert, Struve and Cox as to Young's statements made to or heard by them was inadmissible. The grounds given for inadmissibility are: the testimony amounts to an expression of a legal conclusion; there was no showing that Young was authorized by Esteve or Gant Cooley to make the statements; and the testimony was not admissible for impeachment purposes because it would be collateral impeachment.

The substance of the statements charged to Young was that the contracts having a micronaire schedule similar to the one in the Young-Hancock contract did not cover cotton in excess of 3.5 micronaire and Young would be willing to buy such cotton that was outside the contract coverage. This testimony followed Young's testimony of his intent in making the contract, his understanding what the contract covered, and his denial that he had made the statements to Duckett, Lambert and Struve. The complained of testimony was admitted

by the careful trial judge for the limited purpose of aiding the jury, if it did, in determining the intent of Young and Hancock at the time they entered into the contract. Under these circumstances we believe that, on balance, it was within the discretion of the trial judge to receive the testimony limited to its relevancy to the contested issue of intent. See 1 C. McCormick and R. Ray, Texas Law of Evidence § 685 (2d ed. 1965).

The attack concludes by a challenge to the trial court's exclusion of the tendered contracts executed by the witnesses Walker and Means with the same price provisions as the Young-Hancock agreement and their evidence that they made full delivery of all premium micronaire cotton at the price shown for 3.5 micronaire cotton. The claim of admissibility is that the tender was evidence of trade usage, showing it was the practice of cotton farmers to make written contracts using the term "3.5" in the sense that it refers to all cotton of 3.5 and better. The refusal of the tendered evidence is said to be significant because thirteen defense witnesses were allowed to testify that the Young-Hancock contract did not cover cotton above a 3.5 micronaire reading.

Walker and Means gave testimony, previously summarized, of their understanding of the custom of selling cotton and expressed their opinions, which were favorable to Esteve's position, of the coverage under the Young-Hancock contract. Means testified that his contract looked like the one at issue. During his testimony, Young declared that he had entered into contracts with Walker and Means which had the same price provisions as the one before the court.

 Generally, contracts with other persons are excluded. 2 C. McCormick and R. Ray, Texas Law of Evidence § 1523 (2d ed. 1956). In any event, with the proceedings thus postured, the exclusion of the

---

**3.** The same authority states that writings which employ technical terms are susceptible to interpretation by expert opinion; however, in view of the disposition compelled by the

complaint, we do not reach the question whether this principle is applicable to the facts of this record.

proffered evidence, if error, was not reasonably calculated to cause and probably did not cause the rendition of an improper judgment, nor did it prevent Esteve from making a proper presentation of the case on appeal. Rule 434, Texas Rules of Civil Procedure.

Consistent with the foregoing, Esteve's points of error are overruled. We do not consider Hancock's cross-point which is to be reached only in the event of a reversal and remand.

The judgment is affirmed.